[L. A. No. 3142. Department Two.—October 4, 1913.]

RICHARD F. SIMONEAU, Administrator of the Estate of William Alexander Campbell, Deceased, Respondent, v. PACIFIC ELECTRIC RAILWAY COMPANY (a Corporation), Appellant.

NEGLIGENCE—STREET-RAILROADS—MUNICIPAL ORDINANCES REGULATING SPEED—VIOLATION OF ORDINANCE AS EVIDENCE OF NEGLIGENCE.— A city may by a general municipal ordinance, or by a special ordinance granting a particular franchise, prescribe reasonable conditions and regulations under which a street-railroad company shall operate its cars over or across the streets of the city, including the rate of speed, and a violation of such regulations is *per se* evidence

of negligence rendering the company responsible for any injury occasioned thereby, provided a violation of the ordinance proximately contributes to the injury complained of.

ID.—ORDINANCE GRANTING FRANCHISE—ABSENCE OF PENALTY.—Such rule is applicable to a special ordinance granting a franchise to a street-railroad company, notwithstanding the only penalty provided for a violation of its provisions is that the city may forfeit the franchise.

ID.—DEATH CAUSED BY CAR RUNNING AT EXCESSIVE SPEED OVER STREET CROSSING—ORDINANCE ADMISSIBLE IN EVIDENCE.—In an action against an electric street-railroad company to recover damages for the death of a person who was run over by a car of the company at a public street crossing in a city, alleged to have been caused through the negligence of the company in running its car over the crossing at an excessive rate of speed, in violation of a special ordinance of the city granting the company a franchise, the special ordinance, limiting the rate of speed at which the company could run its cars over street crossings, is admissible in evidence.

ID.—CONFLICT OF EVIDENCE—SIGNALS SHOWING INTENT TO STOP CAR—WARNING SIGNALS.—In such action, in view of the conflict of the evidence, it is held that it was for the jury to determine whether certain signals by the motorman as the car approached the crossing indicated an intent to stop the car at the crossing, or were warning signals given to indicate that the car would not stop.

ID.—CONTRIBUTORY NEGLIGENCE—CONFUSION CAUSED BY HEADLIGHT—CROSSING IN FRONT OF CAR.—It is held further that the evidence respecting the signals given by the motorman of the approaching car, and the confusing nature of the headlight thereon, was such as to warrant the jury in finding that the deceased, who expected to board the car as a passenger, was not guilty of contributory negligence in crossing the track in front of the car.

ID.—EVIDENCE OF DAMAGES—PHYSICAL CONDITION OF CHILDREN OF DECEASED AT TIME OF DEATH.—In an action to recover for such negligent killing of a man who was married and the father of several minor children, evidence is admissible, on the question of damages, to show the permanent crippled condition of certain of the children at the time of the father's death.

ID.—EVIDENCE OF PHYSICAL CONDITION OF MEMBERS OF FAMILY AFTER DEATH OF DECEASED.—It is not, however, permissible to introduce evidence of the condition of the family respecting illness or misfortune suffered by some of its members subsequent to the death of the deceased, and not following as a proximate result thereof.

ID.—APPEAL—REMITTING PART OF DAMAGES—AFFIRMANCE ON CONDITION THAT DAMAGES ARE REMITTED.—Where upon appeal by the defendant in such action from a judgment in favor of the plaintiff and

*from an order denying it a new trial, the appellate court determines that the only ground warranting a reversal was the erroneous admission of incompetent evidence on the subject of damages, it may, instead of ordering a reversal, affirm the judgment and order, on condition that the plaintiff remit such a portion of the judgment as is shown to measure the extent to which the defendant was prejudiced by the introduction of the incompetent evidence.*

APPEAL from a judgment of the Superior Court of Los Angeles County and from an order refusing a new trial. Frederick W. Houser, Judge.

The facts are stated in the opinion of the court.

J. W. McKinley, and R. C. Gortner, for Appellant.

Ernest E. Wood, and Walton J. Wood, for Respondent.

LORIGAN, J.—This action was brought to recover damages for the death of William A. Campbell, alleged to have been killed by a car of the defendant while it was being run over a public crossing at the intersection of Long Beach Avenue and 38th Street in the city of Los Angeles. A verdict was returned in favor of the plaintiff and from the judgment entered thereon defendant appeals, as it also does from an order denying its motion for a new trial.

This case was here before on an appeal by the defendant from a judgment in favor of the plaintiff and was reversed on account of error on the part of the trial court in admitting in evidence a general ordinance of the city of Los Angeles regulating the rate of speed of cars upon street-railroad tracks over street crossings in said city. It was held, on grounds there stated, that such ordinance did not apply to the operation of the cars of the defendant over its railroad tracks at the crossing where the death of Campbell occurred. On this matter see *Simoneau v. Pacific Electric Railway Co.*, 159 Cal. 494, [115 Pac. 320]. On the return of the cause to the trial court plaintiff amended his complaint by striking out the allegation setting up such general speed ordinance which this court had decided to be inapplicable and setting up an ordinance of the city of Los Angeles granting a franchise to the defendant for the construction and operation of its electric

railway along its private right of way, crossing, among others, 38th Street, and which franchise ordinance contained a provision that the cars of the defendant should never travel or be propelled by said railroad across any of the streets therein mentioned, including the said 38th Street, at a greater rate of speed than eight miles an hour. With this amendment the allegations of the complaint stood as originally made, and charged negligence on the part of the defendant in several particulars. On this appeal it is only necessary to refer to two. These are that the employees of the defendant negligently and wantonly caused the car by which the deceased was killed to be run over said crossing at a greater rate of speed than eight miles an hour and at a rate of speed of more than twenty miles an hour; that the employees of said defendant in charge of said car sounded a whistle twice just prior to the time they reached the said crossing as an indication that the car would slow down and stop at said crossing, and then negligently failed to cause the said car to slow down in pursuance of said signal and thereby misled the said Campbell as to the rate of speed at which the said car would approach the said crossing.

In its answer the defendant denied that two blasts of the whistle or any blasts were given by the motorman of the defendant as indicating that the car would stop at the crossing, but admitted that the whistle was sounded several times by the motorman just prior to approaching the crossing, and alleged that these several whistles were sounded to give warning and alarm of the approach of the car, and not otherwise; that the blowing of said whistle was not intended or understood as giving any notice of an intention to stop said car, but was given and intended and was understood as a notice of the approach of the car and of danger to any one upon or near its tracks.

The car by which Campbell was killed was a local one operating between the northern and southern limits of the city. In the district of the city which embraced the crossing at 38th Street it was not the custom of the employees of defendant to stop its cars at every crossing therein but only when signaled for. About eight o'clock on the evening of December 24, 1906, Campbell accompanied by a friend named Ross, started from their place of employment in the city of Los Angeles to

take a southbound local car of the defendant at the 38th Street crossing. As they proceeded to do so, Campbell, who was encumbered in his progress by an armful of bundles and a small Christmas tree which he was carrying, seeing a car coming in the distance, told Ross to hurry on and flag it. Ross did so, crossed the track, and as he testified, took up his stand at a point where it was usual for passengers to board the cars and waved his hand toward the approaching car as notice that it should stop. He testified that in response to his signals the motorman whistled twice, which, as Ross, who was in the habit of taking cars at this point, and also others, testified, was the usual signal given by the motorman indicating that he would stop after the wave of a hand·by a person contemplating boarding a car at such crossing. As the car approached after giving the signals, Campbell started across the track toward the point where Ross was standing, and while doing so, was struck by the oncoming car and killed: It appears that the car when it hit Campbell was going at the rate of at least thirty miles an hour. The car was equipped with an electric headlight and there was an electric light suspended over the street at the crossing. Though the night was dark, Ross when he crossed over, signalled the car, and stood waiting its approach, was under the beams of the suspended electric light. One of the passengers on the car saw him cross the track as the car approached the crossing. The motorman testified that he did not see Ross cross the track nor see him signal for the car to stop; that as the car was a local one, he would have stopped had he seen any one signal, but as he did not notice any one do so he did not stop and had not intended doing so. He also testified that the only whistles he gave were the regulation crossing whistles—two long and two short blasts—which he gave some five hundred feet before he reached the crossing; that the first he saw of Campbell was when the car was about a hundred feet from the crossing and Campbell was walking quickly across in front of it; that immediately on discovering Campbell's position, he put on the airbrakes and attempted to stop the car, but Campbell was struck before he succeeded in doing so; that the 38th Street crossing was a point where passengers frequently got on the cars and that it was the duty of employees on the local cars such as he was running, to stop at this crossing on the signal

of passengers and to look out for such signals. There was also evidence in the case that by reason of the intensity of the headlights reflected from cars operated on the line of the defendant across 38th Street, it was difficult for one looking in the direction of an approaching car to determine the distance of the car or the rate of speed at which it was approaching. The franchise ordinance of the defendant to which we have referred as pleaded in the complaint was also introduced in evidence by the plaintiff.

Appellant asserts as errors warranting a reversal, the denial by the trial court of its motion for a nonsuit and for a directed verdict in its favor which were both predicated on the claim that the case disclosed no negligence on the part of the defendant, but that the deceased was guilty of contributory negligence. It is also insisted that erroneous rulings prejudicial to the defendant in the admission of evidence were made.

Under this last assignment of error it is insisted that the court erred in admitting in evidence the ordinance granting a franchise to the defendant in which the rate of speed of its cars was limited to eight miles an hour over the crossings of the city and which included the 38th Street crossing. It is, of course, well settled that a city may by a general municipal ordinance prescribe reasonable conditions and regulations under which street railroad companies shall operate their cars over or across the streets of a city, including the rate of speed, and that a violation of such regulations is *per se* evidence of negligence rendering the company responsible for any injury occasioned thereby provided a violation of the ordinance proximately contributes to the injury complained of. (*Siemers* v. *Isen,* 54 Cal. 418; *Driscoll* v. *Cable Ry. Co.,* 97 Cal. 553, [33 Am. St. Rep. 203, 32 Pac. 591]; *McCune* v. *Santa Clara M. & L. Co.,* 110 Cal. 480, [42 Pac. 980]; *Stein* v. *United Railroads,* 159 Cal. 368, [113 Pac. 663].) But counsel for appellant claim that this rule has no application to such an ordinance as is relied on here, it being not a general ordinance but a special ordinance granting a franchise. That there is any difference in the rule applicable rests, however, only on the assertion of the appellant. It is supported by no authority, nor is any reason advanced justifying a distinction save that the franchise ordinance constitutes a contract between

the city and the railroad company; that it provides for no penalty for a violation of its provisions, the only provision being that the city may forfeit the franchise should any of its conditions be violated. But these matters afford no reason against the admissibility or applicability of the ordinance. The city had authority in granting the franchise to impose these conditions and the company accepted them. While the ordinance constituted a contract between the city and the company, the condition imposed as to speed was one which the city had the right to make, and it was manifestly imposed for the benefit and protection of the public. The general rule is that where a duty is imposed on any one by statute or by legal authority and that duty is violated, such violation is always evidence of negligence and when injury results therefrom the person injured is entitled to recover therefor. There is no reason for any distinction between general ordinances limiting speed and a franchise ordinance doing so. Both are regulations properly within the power of the city to enact or provide for, and are both solely for the protection of the public against injury. While we are not referred to any authority by appellant in support of its claim against the admission in evidence of this ordinance, on the other hand, in the case of *Chouquette* v. *Southern Electric R. R. Co.,* 152 Mo. 257, [53 S. W. 897], the same claim of inapplicability of a franchise ordinance was made as here, and it was held that where the rate of speed at which a company may run its cars is limited in the ordinance granting the franchise, the company is chargeable with negligence at the suit of a private person against it if it runs its cars at a greater rate of speed.

The claim of the appellant that the evidence fails to show that the defendant was negligent but shows the deceased was guilty of contributory negligence is without merit. The main evidence relied on by plaintiff in support of the right of recovery was that given with reference to the signals by the motorman as the car approached the crossing. The car was a local one and would have stopped at the crossing on signal. Campbell and Ross both desired to take it and the latter was sent ahead by the former to signal it to stop. This, Ross testified, he did, and received responses from the motorman of two whistle blasts which he understood, and which the testimony of other witnesses showed were the usual whistles and

generally understood by persons traveling on such cars to indicate that cars would stop, and which the jury had a right to assume Campbell understood to indicate that the approaching car would stop at the crossing. The testimony on the part of the defendant denied that the signals were given as claimed but that only warning or danger signals were given which indicated and were generally understood to indicate that the car would not stop. In this conflict of the evidence on this matter it was for the jury to determine which testimony it would accept, and from the general verdict returned it is clear that it accepted the testimony on this subject as produced on behalf of the plaintiff. This being true, it is unnecessary to discuss the proposition that the failure of the motorman to lessen the speed of his car and slow down after announcing an intention to do so, clearly constituted negligence on the part of the defendant.

Now as to the claim of appellant that the deceased was guilty of contributory negligence. It is said by appellant in its briefs that ''Unless excuse for his conduct be found in the whistling of the defendant's car, or the nature of the headlight, the act of the deceased must confessedly constitute negligence'' which directly contributed to his death. But the evidence warranted the jury in finding, as is necessarily implied from their verdict in favor of the plaintiff, that the conduct of the deceased was excused for both the reasons suggested, and, hence, against the defendant on its claim of contributory negligence. The matter of the headlight bore on the question of the extent to which Campbell could observe the distance that the car was away from the crossing when he attempted to cross, and the rate of speed at which it was coming. There was no obstruction on the track which would intercept his vision but there was much evidence to the effect that on account of the intense brilliancy of the headlight he could not either see the car or determine the distance or rate of speed at which it was approaching the crossing. The testimony of one witness on this subject illustrates the testimony of many. He testified: ''When a car is coming from the north with a bright headlight on you see only the bright light. The light is so strong that it obscures the car. All you see coming is the bright light out of the darkness. You cannot judge the distance the car is away from you. And at no

given time can you tell accurately or with any degree of certainty how fast the car is coming. . . . If you look steadily at the headlight as the car approached you, the brightness of the headlight would dazzle your eyes—if you looked into the center of it. If you just glanced at it, as the ordinary pedestrian would, you could not tell about where it was. Couldn't tell anything about it at all.''

In determining the question of whether Campbell exercised ordinary care and prudence in crossing the track in front of the approaching car, the jury had a right to take into consideration his motive and purpose in doing so in connection with the conditions as they existed when he made the attempt. Of course the duty of one about to cross a railroad track is to look and listen in order to avoid an approaching train and not walk heedlessly into a place of danger. It is not pretended that Campbell by listening could have determined whether the car was approaching at such a rate of speed as would indicate to him either that it would or would not stop at the crossing, and the confusing character of the headlight rendered it impossible for him to tell by looking at what rate of speed the car was coming or whether it had or had not lessened its approaching speed. Under these circumstances the jury was warranted in considering to what extent the deceased was justified in relying on the signals given by the motorman that the car would stop, rather than any observation he might make of the rate of speed the car was approaching or its distance away. The only purpose the deceased had in crossing the track was to take the car if it was a local one. If the whistles which were given were an announcement that the car would stop, the deceased had a right to assume that it was a local car and would slacken its speed of approach and stop on reaching the crossing, and that such signals were an invitation to cross over so that he might board the car. If the car had lessened its speed so as to effect a stoppage at this point, the attempt of the deceased to cross over when he did would have been successful. The jury was warranted from the evidence in assuming that Campbell knew that the approaching car was a local one which he intended to board; that as indicated by the whistles it would lessen its speed and stop at the crossing; that on account of the confusing nature of the headlight it was impossible for Campbell to determine

the speed or distance of the approaching car, and that in hurrying across the tracks he relied entirely upon the signals indicating that the car would stop.   It was particularly a matter for the jury to determine whether under these circumstances Campbell exercised ordinary prudence in relying upon the signals as given by the motorman.   Necessarily under their general verdict they determined that he did and it cannot be said that this inference under the circumstances was not a proper one for the jury to draw.

It is insisted that the court erred in admitting evidence offered by plaintiff as to the quality, strength, and effect of headlights on the cars of the defendant operated on its lines over this crossing.   It was certainly competent for plaintiff to produce such evidence if it were confined to the headlight of the car which occasioned the accident or cars carrying headlights of equal strength and brilliancy operating over the crossing, under similar conditions as obtained on the evening of the accident.   Such evidence was admissible to show the conditions prevailing at the time Campbell attempted to cross the track as bearing on the question of his alleged contributory negligence.   As both interurban and local cars ran on the tracks of the defendant over this crossing it is claimed that the testimony of the witnesses of the plaintiff applied indiscriminately to the headlights on both classes of cars, while it is claimed that headlights of the interurban cars are much more brilliant than on the local, and that the testimony should have been confined to the headlights of the latter.   So it should, but that there was any difference only appeared when defendant was putting in its evidence.   No such difference appeared in the testimony of any of the witnesses for plaintiff.   The claim now made by appellant is that plaintiff should have laid the proper foundation for this evidence by showing that the headlights being testified to were similar to those used on the local car which struck Campbell.   But the objection in the lower court was only that the testimony was irrelevant, immaterial, and incompetent, which was obviously without merit.   The specific objection now urged that the proper foundation for the admission of this testimony was not laid by plaintiff was not made in the lower court and it will not be permitted to be urged here for the first time.

These are the only points made for a reversal, save the claim that the court erred in the admission of testimony given by the widow of the deceased as to the illness of the children and herself covering a period of four or five years which intervened between the death of her husband and this second trial.

Campbell was killed on Christmas eve while on his way home with bundles and a Christmas tree. He left a widow and three minor children; one of them a girl eight years of age, was, at the time of his death and had been from birth, permanently afflicted with a turned shoulder blade; another child, a girl, had a broken elbow and a permanently stiffened arm as a result of its injury. After showing these particular afflictions under which these children were suffering at the time of the death of their father, the court, over the repeated objections of the defendant, allowed the widow of the deceased to testify further as to various ills and sicknesses under which the three children and herself suffered intermediate the time of her husband's death and the trial of the action and the constant medical attention they all required therefor. She was permitted to testify that "the Christmas after Mr. Campbell died my three children were laid up and quarantined with scarlet fever. And the second year, on Christmas, we were in quarantine but we had measles; just around Christmas. Then we had mumps—and we had tonsilitis—and chicken pox. . . . And we had Doctor Webber in the house all the time; Doctor Webber and Doctor Webber, Jr., and Doctor Hubbard. . . . Some months he came three or four—scarlet fever—I may get mixed up in that, because he had come quite often during the time we had scarlet fever, and I take her into the office now. I could not tell how many times, because we have had him so many times I don't remember. The second girl still goes to Dr. Webber for her heart. She has got rheumatism going to her heart. She just got cold last winter when it rained, going to school." In response to an inquiry whether her own health had been good, she testified: "No, it has not lately, not very good, but it had been two years after his death, until I got cold in my lungs last year during the rain; I had rheumatism and neuralgia, was all."

Counsel for plaintiff claim to find authority for the admission of this evidence in the opinion of this court on the previ-

ous appeal in the case heretofore referred to. But a simple consideration of that case shows that it nowhere sanctions the admission of such evidence as is recited. There, the only question was whether evidence of the permanent crippled condition of the two children at the time of the father's death— the one with a turned shoulder, the other with a stiffened arm —was admissible on the question of damages. It was held that it was and so that evidence was properly admissible on this last trial. By reason of their permanent afflictions existing at the death of their father they had a right to expect from him, had he lived, a future greater measure of comfort, care, and assistance than had their afflictions not existed. This benefit which they had a reasonable certainty of receiving from their father, had he lived, was a proper element to be taken into consideration in determining the value of his life to them and as measuring their pecuniary loss through his death. They were specific benefits which, by reason of such infirmities, they might reasonably expect would be received by them from their father beyond what might be expected by children in normal conditions of health at his death. This was pointed out in the former decision and evidence of such conditions held to be proper matter for consideration by the jury in estimating damages. It was not held in that case, not even intimated, that evidence of the condition of the family respecting illness or misfortune suffered by some of its members subsequent to the death of the deceased could be shown. Nor do the cases cited in that opinion which respondent claims also to rely on support such a right. They had reference to conditions of ill health existing at the time of the death of the deceased. In *Cook* v. *Clay St. Ry. Co.*, 60 Cal. 604, the wife had been an invalid for eight years prior to the death of her husband. In *Evarts* v. *Santa Barbara etc. Ry. Co.*, 3 Cal. App. 712, [86 Pac. 830], it appears that prior to the husband's death the wife was an invalid. In fact, our attention is not called by counsel for respondent to any case which sustains the admission of the evidence objected to. The cause of action of the family of the deceased arose immediately upon his death and the defendant became then responsible to them in damages for the probable pecuniary loss suffered by them in being deprived of the future support, care, comfort, and society of the deceased. But this pecu-

niary loss was to be determined by conditions existing at the time of the death of the deceased, taking into consideration in measuring it these prospective benefits which the members of the family were deprived of by his death. The liability of the defendant could not be in any manner affected by matters occurring to the family subsequent to that time. Changed conditions in the family of the deceased, adverse circumstances or misfortunes in the way of sickness which are in no way connected with or related to the death of the deceased but occur subsequently thereto are not matters for which the defendant is responsible and are inadmissible for any purpose. While evidence of the permanent crippled condition of the two children was competent evidence, as pointed out in the former decision, evidence that the whole family or some members of it, after the death of the deceased, and intermediate that time and the trial of the present action, suffered from scarlet fever, measles, mumps, chicken pox, tonsilitis, and rheumatism of the heart (some of these afflictions necessitating a quarantine of the family two successive Christmases—approximately anniversaries of the death of the deceased), and that the widow lately had not enjoyed such good health as at the time of her husband's death, were all matters clearly inadmissible. Evidence of them was neither pertinent nor competent on the matter of damages sustained by the children or widow. They were conditions of ill health and sickness which prevailed subsequent to the death of the deceased; they did not follow as a proximate result of his death but were entirely independent, distinct, and unrelated to it. If such evidence were admissible then it would be equally proper in a similar action to show that subsequent to the death of the deceased far more disastrous troubles had afflicted a family; that paralysis had afflicted one child or that another had suffered a loss of a limb, or that financial reverses had impoverished the family which, of course, no one would pretend could be shown.

And yet, in principle, there could be no difference as to the right to have such testimony presented.

As to the testimony which was permitted to go in it is quite clear that the only effect which it could have was to present a picture of misery and affliction suffered by the family of deceased during the years subsequent to his death and up to

the time of the trial of this action, the direct and inevitable tendency of which was to arouse the sympathy of the jury to the end that they might improperly enhance the amount of damages to be awarded beyond what the competent evidence in the case would have permitted. As this was the only purpose to be accomplished by its admission, the evidence should have been excluded. The court erred in not doing so and a reversal must follow.

The judgment and order appealed from are reversed.

Melvin, J., and Henshaw, J., concurred.

Hearing in Bank denied.

In denying a hearing in Bank the court on November 3, 1913, rendered the following opinion:

THE COURT.—The petition for a rehearing in this case, as far as it is based on alleged error committed in the department decision, is denied.

As, however, the only ground upon which the judgment and order denying a new trial was reversed was for the erroneous admission of evidence on the subject of damages, the respondent asks that he be permitted to remit the sum of three thousand dollars, and that upon such remission, the order denying a new trial and a judgment against defendant for seven thousand dollars be affirmed.

There can be no question but that this court in a proper case may do this (Code Civ. Proc., sec. 53; *Tarbell* v. *Central Pac. Ry. Co.*, 34 Cal. 616; *Kinsey* v. *Wallace*, 36 Cal. 463; *Davis* v. *Southern Pacific Co.*, 98 Cal. 18, [35 Am. St. Rep. 133, 32 Pac. 708], and we think this is a proper case for doing so.

This is the second appeal in this case from a judgment in favor of the plaintiff. On the first trial the jury awarded plaintiff a verdict for seven thousand dollars damages. On the appeal thereupon taken there was no claim that the verdict was excessive, the only point urged against it so far as the amount was concerned being that evidence of the permanently crippled condition of two of the children of deceased was inad-

missible. We held that such evidence was proper. The judgment, however, was reversed solely because of the erroneous admission in evidence of a general speed ordinance of the city of Los Angeles which it was held did not apply to the defendant. (*Simoneau* v. *Pacific Electric Co.,* 159 Cal. 494, [115 Pac. 320].)

On the second trial out of which this appeal arises, there was no practical difference in the evidence produced in the two cases as far as the points presented on appeal in either case disclose, save as to the evidence on the question of damages. While the general speed ordinance was held inadmissible on the former appeal, still on the second trial the franchise ordinance which embraced a similar limitation was admissible, so that the only difference in the evidence was on the subject of damages, the testimony as to the sickness of the children and the widow intermediate the death of Campbell and the second trial being improperly put before the jury as was pointed out in the opinion in the present appeal. On the second trial with this improper evidence before the jury it returned a verdict for ten thousand dollars in favor of the plaintiff. It must be presumed that the jury on the first trial with entirely legitimate evidence before it made a fair and conscientious award when it fixed the damages at seven thousand dollars. With that as a basis for consideration it is quite reasonable, and no doubt the fact, that the difference between the amount awarded on the first trial and the verdict of the jury on the second trial was the result of the objectionable and inadmissible evidence, and that this prejudiced appellant to the extent of the difference between these verdicts—namely, three thousand dollars.

This case has been in the courts for nearly seven years. A jury has on both trials determined that the plaintiff is entitled to recover. In the present appeal we have decided all questions raised in the case by appellant adversely to it save solely this one as to the evidence on the subject of damages. When we take into consideration the verdict of the jury for seven thousand dollars returned on the first trial under competent evidence and which verdict was not challenged on appeal as being at all excessive, we have a proper standard for all practical purposes under which may be determined the extent to which the defendant was prejudiced by the intro-

duction of this incompetent evidence, and this was to the extent of three thousand dollars. This is what is claimed by appellant as the result of the admission of such testimony. That this is true being fairly apparent, there is no reason why if the respondent is willing to remit that amount he should not be permitted to do so.

In conformity with this view, the judgment heretofore given on this appeal is modified to this extent, that if the respondent shall within thirty days after this date release the verdict and judgment in his favor to the extent of three thousand dollars, the order denying a new trial to appellant shall stand affirmed. If such consent be not filed within such time, the judgment and order denying a new trial shall be reversed.

The appellant to recover its costs.