[Civ. No. 15685. Fourth Dist., Div. Two. Feb. 24, 1977.]

EILEEN LITTLE, Plaintiff and Respondent, v.
STUYVESANT LIFE INSURANCE COMPANY,
Defendant and Appellant.

452

454

COUNSEL

Thompson & Colegate, Don C. Brown, and Edward L. Lascher for Defendant and Appellant.

Kearney & Miller, Olen G. Miller and Matthew M. Kearney for Plaintiff and Respondent.

OPINION

KAUFMAN, J.—Claiming to be totally disabled and, thus, entitled to benefits under a group disability insurance policy issued by defendant, plaintiff sought declaratory relief and compensatory and punitive damages for intentional infliction of emotional distress. A jury trial resulted in a special verdict that plaintiff was totally disabled and general verdicts in favor of plaintiff for $172,325 in compensatory damages and $2.5 million in punitive damages. Judgment was entered on the jury verdicts.[1] Defendant's motion for new trial as to the issue of damages was denied. Defendant appeals from that portion of the judgment awarding plaintiff $172,325 compensatory damages and $2.5 million punitive damages.[2]

*Factual Summary*

Although some factual details will be set forth in our discussion of several of the issues, we shall make no attempt to detail all of the facts. The following summary will suffice.

From 1958 until August 7, 1970, plaintiff was employed as a draftsman by C. M. Engineering in San Bernardino. On September 1, 1967, she became insured under a group life, hospitalization and disability insurance program sponsored by a trade association of which C. M.

---

[1]The judgment as entered did not include any provision for the payment of benefits under the disability policy. On hearing of defendant's motion for new trial, pursuant to stipulation of the parties, the court ordered the sum of $4,757.70 to be paid to plaintiff as disability benefits due under the policy from June 7, 1974, to August 7, 1975.

[2]On this appeal defendant does not challenge the jury's special verdict that plaintiff was totally disabled within the meaning of the policy, nor, of course, does it appeal from the court's order pursuant to stipulation for the payment of $4,757.70 in disability benefits under the policy. (See fn. 1, *ante.*) Defendant impliedly, and correctly we believe, treats the latter court order as part of the judgment.

Engineering was a member. The disability insurance portion of the program was underwritten by defendant. It provided for combined disability payments by defendant and social security of 60 percent of normal salary. Benefits were payable for two years if the insured was disabled from performing the usual and customary duties of her occupation. Thereafter payments would continue until the insured reached age 65 only if the insured was disabled from "engaging in each and every occupation or employment . . . for which [s]he is reasonably qualified by training, education or experience. . . ."

The evidence that plaintiff was in fact totally disabled was overwhelming. Her medical history is almost unbelievable. Prior to the effective date of the insurance, she had undergone abdominal surgery in 1954, bunion surgery in 1955, a hysterectomy in May 1960, a myelogram and a lumbar laminectomy performed by Dr. Ballard, an ortheopedic surgeon, in the fall of 1965, a second myelogram and a lumbar fusion performed by Dr. Ballard in late 1966. Although she continued working, she wore a brace while working and took medication to relieve her pain on a daily basis.

In the spring of 1969 plaintiff noticed severe pain in her right elbow, radiating down into her hand. Dr. Ballard gave her injections of estrogen and later cortisone. She also experienced pain in her neck, which gradually got worse in January 1970. The pain extended from her neck across her shoulder and into the right arm and hand. Dr. Ballard prescribed home traction three times a day, but this treatment increased the pain. The pain became worse, and during the course of an examination by Dr. Ballard in July 1970 plaintiff experienced such extreme pain that she passed out. Dr. Ballard immediately referred her to Dr. Estridge, a neurosurgeon.

Dr. Estridge hospitalized her and on August 12, 1970, performed an anterior fusion of C5-6. On December 2, 1970, following another myelogram, Dr. Estridge performed a second fusion at the level of C6-7. The plug on the lower fusion worked out, necessitating another fusion of plaintiff's cervical spine on February 22, 1971. On October 5, 1971, Dr. Estridge performed a fourth surgery to relieve the nerve roots of scar tissue.

Plaintiff continued to work until she was hospitalized by Dr. Estridge in about August 1970. At that time she applied for state disability benefits as well as disability benefits from defendant under the policy.

After six months she applied for social security disability which was awarded her. Additionally, based upon her total disability, she applied for and was granted a waiver of premiums on the life insurance portion of the insurance program.

In July 1972, Dr. Estridge wrote to the referring physician, Dr. Ballard, expressing the opinion that plaintiff continued to have symptoms of nerve root irritation which precluded her occupation as a draftsman. In September 1972, Dr. Estridge reported that plaintiff's condition was permanent and stationary and that she was completely disabled from her regular work. In December 1973, he reported that she continued to have disabling pain caused by perineural fibrosis, requiring pain medication and precluding any activity. At trial Dr. Estridge testified that there had been little change in plaintiff's condition, that he anticipated no further improvement and that it was very unlikely that she would ever be able to be gainfully employed. Her condition precluded even general sedentary work.

At trial plaintiff testified she suffered constant pain in her right shoulder, neck and low back which was aggravated severely upon exertion, walking, standing or sitting. She took daily doses of painkillers and tranquilizers. Although she could bathe and dress herself and do light housekeeping, she was unable to read because she could not hold a book. She could not do sewing for more than 20 minutes at a time because her arms and fingers, neck and shoulders ached. She was unable to write letters because the position led to spasms in her shoulders and arms. She could not shop without help. She had difficulty sleeping at night, even after taking medication. She could not sleep on her back, and when sleeping on her side, the opposite arm became numb.

Defendant knew or is charged with knowledge of most of these facts. The insurance was sold to plaintiff by Lawrence O. Graeber, Jr., defendant's agent. Mr. Graeber knew of plaintiff's past medical history at the time she obtained coverage. Indeed, her medical history was used as a selling point. Mr. Graeber told plaintiff that some day the insurance would be a "godsend" to her. Copies of Dr. Estridge's reports of September 1972 and December 1973 were furnished to defendant. In addition, Mr. Graeber informed defendant that plaintiff had been classified as totally disabled by the Social Security Administration and that the premiums on the life insurance portion of the insurance program had been waived on the basis of plaintiff's total disability.

From sometime in the fall of 1970 to October 10, 1972, defendant paid plaintiff disability benefits under the policy. In August or September 1972, the initial period of two years was drawing to a close. Defendant employed Retail Credit Company to conduct an investigation into plaintiff's claim of total disability. The resulting report tended to substantiate plaintiff's claim.

Thereafter defendant had plaintiff examined by Dr. Haft, an ortheo-pedic surgeon in Los Angeles. Dr. Haft found plaintiff to have approximately 50 percent limitation of motion in her cervical spine, but opined that she was not disabled from employment as a draftsman. Dr. Haft did not know, however, what physical activity work as a draftsman entailed. Neither was he supplied with any of plaintiff's medical records or any of the medical reports from plaintiff's treating physicians.

On the basis of Dr. Haft's report, defendant sent plaintiff a letter on October 31, 1972, informing her that disability payments were terminated as of October 10, 1972, and that her file was closed.

On July 16, 1974, after suit was filed and without having received any new information of significance and as a result of a conference between defendant's vice president in charge of accident and health claims and its legal claims examiner and claims committee, defendant paid plaintiff the sum of $8,382.38 representing disability benefits under the policy for the period October 10, 1972 to June 7, 1974. Disability benefits were again terminated following this payment, and no further payments were made until after trial.

On September 16, 1974, defendant had plaintiff examined by Dr. Rocovich, a neurosurgeon in Los Angeles. Dr. Rocovich was provided with a copy of Dr. Haft's report but was not provided with any medical records or reports from plaintiff's treating physicians pertaining to her myelograms or surgeries. Dr. Rocovich did not know what kind of work plaintiff had performed for C. M. Engineering. However, it was his opinion that plaintiff could perform "a half day's work as a receptionist" and that she also had "the ability to open and close a drawer and put a file in and close it." Based on Dr. Rocovich's report defendant declined to make further disability payments for the period following June 7, 1974.

When plaintiff received defendant's letter of October 31, 1972, informing her that disability benefits were being terminated as of

October 10 and that her file was closed, plaintiff "got very, very angry. In fact, I got mad; started crying. Just couldn't understand it."

When she was employed at C. M. Engineering plaintiff earned $1,025 per month gross which netted her approximately $700. During the period defendant was paying her disability benefits under the policy, plaintiff was receiving from combined sources approximately $615 per month. Even so, she was able to meet her financial obligations which totaled approximately $500 per month. The termination of benefits from defendant reduced plaintiff's income to $208 per month. As a result plaintiff was required to borrow money. She borrowed $600 from Bank of America and an additional $1,000 from a brother in Michigan. Additionally, plaintiff was forced to sell her home which she had no intention of doing before defendant terminated benefits. All of this caused plaintiff to feel that she was "just nothing any more, useless." She was deeply depressed. She testified: "I just—I didn't feel like—I didn't want to sell my house; I didn't want to leave and—I had three children down there [in San Bernardino], grandchildren; nice neighbors. [¶] The house I had was very efficient; it was—was something I had always dreamed of, maybe, a little Spanish house. All my furniture was Spanish. [¶] It was something I fell in love with the minute I walked in the door. And to leave it to—to—not even knowing where I was going to go, not knowing what I was going to do—I was just very, very depressed, felt sick."

At her home, plaintiff had installed a swimming pool with a Jacuzzi in which she spent hours every day and which relieved some of her pain. On the morning of February 5, 1973, plaintiff learned from the escrow handling the sale of her home that the loan she took out to build the swimming pool would have to be paid off and she would receive only $1,765 from the sale. At trial she described her anguish: "So I just—I figured I wouldn't get anything back at all. I was just completely—I saw red. [¶] I just decided I didn't want anything to do with anybody—the insurance company—I didn't care, I just wanted to forget everything, go to sleep, forget the whole works. I was thoroughly disgusted and depressed and really down."

Later that day plaintiff ingested the entire contents of a bottle of Valium, consisting of about 30 pills. Plaintiff's attorney, who was then Mr. Wilson, informed defendant that plaintiff had attempted to commit suicide as a result of her financial problems. Defendant's reaction was to

place a memo in the file indicating that the policy did not cover disability resulting from attempted suicide or self-inflicted harm.

Following the sale of her home, plaintiff moved to Arroyo Grande to live with her daughter. Approximately one year later she moved into a HUD project for low income, physically disabled persons. She stayed there from February 1974 to April 1975.

*Discussion of Issues*

*Liability*

Notwithstanding development of the tort known as "bad faith" (see *Silberg* v. *California Life Ins. Co.,* 11 Cal.3d 452 [113 Cal.Rptr. 711, 521 P.2d 1103]; *Gruenberg* v. *Aetna Ins. Co.,* 9 Cal.3d 566 [108 Cal.Rptr. 480, 510 P.2d 1032]; *Fletcher* v. *Western National Life Ins. Co.,* 10 Cal.App.3d 376, 401-402 [89 Cal.Rptr. 78, 47 A.L.R.3d 286]), plaintiff's sole theory of trial (see 6 Witkin, Cal. Procedure (2d ed.) pp. 4269-4270) and the sole theory upon which the jury was instructed was the tort of intentional infliction of emotional distress. Defendant contends that there is no substantial evidence to support the jury's implied finding that defendant committed that tort. This contention is not meritorious.

█ "The elements of a prima facie case for the tort of intentional infliction of emotional distress are: (1) outrageous conduct by the defendant; (2) the defendant's intention of causing or reckless disregard of the probability of causing emotional distress; (3) the plaintiff's suffering severe or extreme emotional distress; and (4) actual and proximate causation of the emotional distress by the defendant's outrageous conduct." (*Fletcher* v. *Western National Life Ins. Co., supra,* 10 Cal.App.3d 376, 394, and authorities there cited.) When the evidence is conflicting or when conflicting inferences may be drawn from the evidence, the existence of each of these elements is, of course, a question of fact.

### 1. *Outrageous Conduct*

█ Pointing out that its communications with plaintiff were polite and businesslike and contained no threats, accusations or false statements, defendant urges that it did nothing more than decline to pay a disputed claim relying upon the opinions of the reputable physicians to

whom it sent plaintiff for examination and that this it was privileged to do (*Fletcher* v. *Western National Life Ins. Co., supra,* 10 Cal.App.3d at p. 395). That is one possible view of the evidence. Viewing the evidence most favorably to plaintiff who prevailed below, however, reasonable inferences may be drawn that defendant purposely ignored the great bulk· of the medical information it had and withheld that information from the physicians it selected to examine plaintiff and that it sought only to justify its predetermined course of discontinuing disability benefit payments justly due plaintiff under the policy. While this conduct is less egregious than that of the defendant in *Fletcher* (10 Cal.App.3d at p. 392), the jury was fully justified in impliedly finding defendant's conduct outrageous.

## 2. *Intent*

■ Viewing the evidence most favorably to plaintiff, the jury was likewise fully justified in inferring that defendant acted with reckless disregard of the probability of causing plaintiff emotional distress. Given a person with plaintiff's medical problems, one would almost certainly expect a reduction in income from $615 per month to $208 per month to result in emotional distress as well as economic problems likely to result in more emotional distress.

## 3. *Severe Emotional Distress*

"[T]he requisite emotional distress may consist of any highly unpleasant mental reaction such as fright, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment or worry." (*Fletcher* v. *Western National Life Ins. Co., supra,* 10 Cal.App.3d at p. 397.) "Severe emotional distress means . . . emotional distress of such substantial quantity or enduring quality that no reasonable man in a civilized society should be expected to endure it." (*Id.*) ■ Plaintiff's testimony constitutes substantial evidence to support the jury's implied finding that plaintiff suffered severe emotional distress. When she received defendant's letter informing her that disability payments were terminated and the file closed she became very, very angry, started crying and could not understand it. She became deeply depressed. Defendant's termination of benefits required plaintiff to sell her home, which she loved and did not want to sell, and when she learned how little money she would receive from the sale, plaintiff became despondent and took an overdose of Valium. Subsequently she was required to move from San Bernardino,

which she did not want to do, and to go to live with her daughter in Arroyo Grande and subsequently to live in a public housing project for low income, disabled persons. It is inferable that over a period of several years plaintiff suffered intense grief, chagrin, disappointment, worry, humiliation, embarrassment and anger.

### 4. *Causation*

■ Defendant urges that plaintiff's suffering resulted not from any conduct on its part but from her many medical problems and the fact that, when her house was sold, she was required to repay a loan she incurred to build the swimming pool and Jacuzzi so that she received little money from the sale. Not so. Viewing the evidence in support of the judgment, it appears that plaintiff suffered anger and anxiety and became deeply depressed as a direct result of defendant's terminating disability payments. It is no doubt true that some of plaintiff's emotional distress resulted from the necessity of selling her beloved home and receiving so little cash from the sale. However, the necessity of selling the home and paying off the swimming pool loan resulted directly from defendant's terminating disability payments thereby reducing plaintiff's income from $615 to $208 per month. The jury was entitled to consider not only emotional distress resulting directly from defendant's conduct but also emotional distress resulting from economic problems caused directly by defendant's conduct. (*Fletcher* v. *Western National Life Ins. Co., supra,* 10 Cal.App.3d at pp. 401-402.)

### 5. *Jury Instructions re Liability*

The court instructed that plaintiff had the burden of proving the following issues:

"(1) Disability of Plaintiff. (In this regard you will be given special interrogatories which you will answer.)

"(2) Infliction of emotional distress on Plaintiff by Defendant.

"(3) Proximate cause.

"(4) Nature and extent compensatory damages.

"(5) That Defendant acted with oppression, fraud or actual malice entitling Plaintiff to punative [*sic*] damages."

■ Defendant complains that this instruction omitted the requirement that to be liable it must have acted with intent or recklessness and the requirement that plaintiff must have suffered severe or extreme emotional distress and that this instruction failed to specify what had to be proximately caused.

The criticism of this instruction is not unwarranted. It does have the deficiencies defendant claims. But, in our view, reversal of the judgment is not required because the deficiencies in this instruction were substantially cured by other instructions. "The instructions must be considered in their entirety, and if, as so considered, they state the law of the case fairly and clearly, then they are, as a whole, unobjectionable, even though by selecting isolated passages from single instructions they may in some respects be amenable to just criticism." (*Douglas* v. *Southern Pacific Co.*, 203 Cal. 390, 396 [264 P. 237]; see 4 Witkin, Cal. Procedure (2d ed.) pp. 3057-3058 and cases there cited.)

The jury was subsequently instructed: "To be entitled to recover for compensatory damages for the intentional infliction emotional distress, plaintiff must show: (1) outrageous conduct by the defendant; (2) the defendant's intention of causing or reckless disregard of the probability of causing emotional distress; (3) the plaintiff suffering severe or [*sic*] emotional distress; and (4) actual and proximate causation of the emotional distress by the defendant's outrageous conduct."

Thus, the jury was advised of the requisite intent and that it was plaintiff's emotional distress that must be shown to have been caused by defendant's conduct. As to the requirement that plaintiff's emotional distress must have been severe or extreme, this instruction is helpful only in part. It does employ the word "severe" in close proximity to the words "emotional distress," but by apparent mistaken omission of the word "extreme" (e.g., severe or extreme emotional distress), this instruction is itself incorrect. The very next instruction, however, reads: "By *severe emotional distress* is meant substantial or enduring emotional distress as distinguished from trivial or transitory. *Severe emotional distress* means emotional distress of such substantial quantity or enduring quality that no reasonable man in a civilized society should be expected to endure it. The requisite of emotional distress may consist of any highly unpleasant mental reaction such as fright, grief, shame, humiliation, embarrassment, anger, disappointment or worry." (Italics added.)

Taking the three instructions together, we think the jury was apprised that, to recover, plaintiff must have suffered severe emotional distress. ■ A reviewing court must adopt the construction of jury instructions which will support rather than defeat the judgment if they are reasonably susceptible to such interpretation. (*Merlo* v. *Standard Life & Acc. Ins. Co.*, 59 Cal.App.3d 5, 14 [130 Cal.Rptr. 416]; *Rupp* v. *Summerfield*, 161 Cal.App.2d 657, 667 [326 P.2d 912].)

## Compensatory Damages

Defendant contends that the compensatory damage award in the amount of $172,325 is not supported by substantial evidence, is excessive as a matter of law and resulted from misdirection of the jury. We have concluded that these contentions are not meritorious.

### 1. *Substantial Evidence*

■ The compensatory award of $172,325 does not include any disability payments due under the policy. The $4,757.70 due under the policy to August 7, 1975, was dealt with by the court in a minute order after judgment. (See fn. 1, *ante.*) Since there was no proof of any other recoverable damages,[3] the compensatory award must be taken as representing compensation for plaintiff's emotional distress. We have already discussed the evidence that plaintiff suffered severe emotional distress. That evidence must be considered sufficient to support the jury's verdict. There is no fixed or absolute standard by which to compute the monetary value of emotional distress, and a reviewing court must give considerable deference in matters relating to such damages to the jury in the first instance and to the trial court secondarily. (*Merlo* v. *Standard Life & Acc. Ins. Co., supra*, 59 Cal.App.3d at p. 17; *Fletcher* v. *Western National Life Ins. Co., supra*, 10 Cal.App.3d at pp. 408-409; accord: *Bertero* v. *National General Corp.*, 13 Cal.3d 43, 64 [118 Cal.Rptr. 184, 529 P.2d 608, 65 A.L.R.3d 878]; *Forte* v. *Nolfi*, 25 Cal.App.3d 656, 688 [102 Cal.Rptr. 455].)

### 2. *Excessive as a Matter of Law*

It is true that an appellate court may reverse an award of damages " '[w]hen the award as a matter of law appears excessive, or where the

---

[3]Although there was evidence that plaintiff was required to borrow funds from her brother and Bank of America, no evidence of the cost of such loans was introduced. Additionally, although plaintiff was required to sell her home, there was no evidence that it was sold for less than its true value.

recovery is so grossly disproportionate as to raise a presumption that it is the result of passion or prejudice . . . .' " (*Cunningham* v. *Simpson,* 1 Cal.3d 301, 308-309 [81 Cal.Rptr. 855, 461 P.2d 39], quoting *Rosenberg* v. *J. C. Penney Co.,* 30 Cal.App.2d 609, 628 [86 P.2d 696]; accord: *Bertero* v. *National General Corp., supra,* 13 Cal.3d at p. 64; *Schroeder* v. *Auto Driveaway Co.,* 11 Cal.3d 908, 919 [114 Cal.Rptr. 622, 523 P.2d 662]; *Merlo* v. *Standard Life & Acc. Ins. Co., supra; Forte* v. *Nolfi, supra.*) While we consider the compensatory award somewhat generous, we cannot in good conscience classify it as so excessive or disproportionate as to raise a presumption that it resulted from passion or prejudice.

### 3. *Jury Misdirection*

At plaintiff's request the court rendered to the jury BAJI instruction No. 14.00 (1975 rev.), BAJI No. 14.10 (1973 rev.) and BAJI (5th ed.) No. 14.13 as follows:

"If, under the court's instructions, you find that plaintiff is entitled to a verdict against defendant, you must then award plaintiff damages in an amount that will reasonably compensate him [*sic*] for each of the following elements of claimed loss or harm [subject to being reduced, as you will be instructed, if you should find that the plaintiff was contributorily negligent], *provided that you find that such harm or loss was* [or will be] suffered by him [*sic*] and *proximately caused by the act or omission upon which you base your finding of liability.* The amount of such award shall include:" (Italics added.)

"The reasonable value of *medical* [*hospital and nursing*] *care, services and supplies* reasonably required and actually given in the treatment of the plaintiff [and the present cash value of the reasonable value of similar items reasonably certain to be required and given in the future]." (Italics added.)

"Reasonable compensation for any *pain, discomfort,* fears, anxiety and other mental and emotional distress suffered by the plaintiff and of which his [*sic*] *injury* was a proximate cause [and for similar suffering reasonably certain to be experienced in the future from the same cause]. [Italics added.]

"No definite standard [or method of calculation] is prescribed by law by which to fix reasonable compensation for *pain and suffering.* Nor is the opinion of any witness required as to the amount of such reasonable

compensation. [Furthermore, the argument of counsel as to the amount of damages is not evidence of reasonable compensation.] In making an award for *pain and suffering* you shall exercise your authority with calm and reasonable judgment and the damages you fix shall be just and reasonable in the light of the evidence." (Italics added.)

First, defendant correctly points out that these instructions were obviously designed for use in accident cases in which the plaintiff suffered physical *injury,* and they should not be given indiscriminately in cases for which they were not designed. To instruct the jury in terms of "injury" was inappropriate (cf. *Richardson* v. *Employers Liab. Assur. Corp.,* 25 Cal.App.3d 232, 240 [102 Cal.Rptr. 547] [disapproved on other grounds in *Gruenberg* v. *Aetna Ins. Co., supra,* 9 Cal.3d at pp. 580-581, fn. 10]), but we do not believe it probable that the jury was misled.

Next, defendant contends that there was no evidence whatever that plaintiff incurred any expense for medical, hospital or nursing care, services or supplies[4] nor any pain or discomfort as a result of any conduct on its part and that therefore it was error to tell the jury that plaintiff was entitled to recover such damages if the jury found defendant liable. Defendant is correct. " 'Even though an instruction is couched in proper language it is improper, if it finds no support in the evidence, and the giving of it constitutes prejudicial error if it is calculated to mislead the jury. [Citations.]' " (*Solgaard* v. *Guy F. Atkinson Co.,* 6 Cal.3d 361, 370 [99 Cal.Rptr. 29, 491 P.2d 821]; accord: *Harpst* v. *Kirkpatrick,* 26 Cal.App.3d 482, 487 [102 Cal.Rptr. 621].)

As plaintiff correctly points out, however, by the proviso in BAJI No. 14.00 (1975 rev.), *supra,* the jury was instructed that damages were to be awarded only for "such harm or loss [as] was . . . proximately caused by the act or omission upon which you base your finding of liability." If it followed this instruction, the jury could not have awarded plaintiff anything for medical expenses or pain, because there was no evidence that any such were caused by defendant's conduct. It must be presumed that the jury abided by the instructions. (*Snodgrass* v. *Hand,* 220 Cal. 446, 448 [31 P.2d 198]; *Rodgers* v. *Kemper Constr. Co.,* 50 Cal.App.3d 608, 630

---

[4]Plaintiff points out that there was evidence that plaintiff was taken to the hospital when she took the overdose of Valium. In response, however, defendant points out that there must be evidence of the amount and extent of such expenses to support a recovery thereof. (*Hansen* v. *Bledsoe,* 130 Cal.App.2d 70, 74 [278 P.2d 514]; see Cal. Attorney's Damages Guide (Cont.Ed.Bar 1974) pp. 279-280.)

[124 Cal.Rptr. 143]; *Roberts* v. *Del Monte Properties Co.,* 111 Cal.App.2d 69, 78 [243 P.2d 914].)

## Punitive Damages

Defendant contends that the punitive damage award of $2.5 million resulted from misdirection of the jury, is excessive as a matter of law, and is in excess of the court's jurisdiction since the prayer for punitive damages was only $250,000. We conclude that the jury was not misdirected on this issue, but we agree that the punitive damage award is excessive as a matter of law. We do not reach the third contention.

### 1. *Jury Misdirection*

At plaintiff's request the court instructed in words substantially identical to BAJI (5th ed.) No. 13.30: "Stuyvesant Life Insurance Company is a corporation and as such can act only through its officers and employees. Any act or omission of an officer or employee within the scope of his [authority] is in law the act or omission of such corporation." Defendant complains that this instruction is a classic instruction on respondeat superior and erroneously informed the jury that defendant could be assessed punitive damages on that theory. (See *Merlo* v. *Standard Life & Acc. Ins. Co., supra,* 59 Cal.App.3d at p. 18; *Hale* v. *Farmers Ins. Exch.,* 42 Cal.App.3d 681, 690-691 [117 Cal.Rptr. 146].) Defendant is mistaken. This instruction did not, as did the instruction in *Merlo,* address itself to liability for punitive damages. Neither was it given in conjunction with the instructions on punitive damages. Defendant is quite correct that this instruction is an instruction on respondeat superior, but that doctrine was in issue in the case on the question of defendant's conduct as regards compensatory damages. Thus, the instruction correctly states the law on the issue as to which it was given. If defendant desired another instruction directed to its answerability for punitive damages it was incumbent upon it to request such an instruction. ■ " 'In a civil case, each of the parties must propose complete and comprehensive instructions in accordance with his theory of the litigation; if the parties do not do so, the court has no duty to instruct on its own motion.' [Citations.]" (*Willden* v. *Washington Nat. Ins. Co.,* 18 Cal.3d 631, 636 [135 Cal.Rptr. 69, 557 P.2d 501]; *Merlo* v. *Standard Life & Acc. Ins. Co., supra,* 59 Cal.App.3d at p. 13; *Downing* v. *Barrett Mobile Home Transport, Inc.,* 38 Cal.App.3d 519, 523 [113 Cal.Rptr. 277], and authorities there cited.)

## 2. *Excessive as a Matter of Law*

 Again, while the judgment of the jury and the trial judge are entitled to considerable deference, " '[w]hen the award as a matter of law appears excessive, or where the recovery is so grossly disproportionate as to raise a presumption that it is the result of passion or prejudice, the duty is then imposed upon the reviewing court to act.' " (*Cunningham* v. *Simpson, supra,* 1 Cal.3d at pp. 308-309, quoting *Rosenberg* v. *J. C. Penney Co.,* 30 Cal.App.2d 609, 628 [86 P.2d 696]; accord: *Bertero* v. *National General Corp., supra,* 13 Cal.3d at p. 64; *Schroeder* v. *Auto Driveaway Co., supra,* 11 Cal.3d at p. 919; *Merlo* v. *Standard Life & Acc. Ins. Co., supra,* 59 Cal.App.3d at p. 17; *Forte* v. *Nolfi, supra,* 25 Cal.App.3d at p. 688.)

 "The primary purpose of punitive damages is to punish the defendant and make an example of him. [Citations.]" (*Merlo* v. *Standard Life & Acc. Ins. Co., supra,* 59 Cal.App.3d at p. 18.) Accordingly, the punitive damages assessed should bear a reasonable relationship to the net assets[5] of the defendant. (*Merlo* v. *Standard Life & Acc. Ins. Co., supra,* 59 Cal.App.3d at p. 18.) Here, the uncontroverted evidence shows defendant's net assets to be slightly more than $16,860,000. The punitive damage award of $2.5 million is in excess of 15 percent of defendant's entire net worth.

Additionally, although there is no fixed ratio by which to determine the propriety of a punitive damage award, punitive damages should bear a reasonable relationship to the compensatory damages awarded. (E.g., *Wilkinson* v. *Singh,* 93 Cal.App. 337, 344-345 [269 P. 705]; *Forte* v. *Nolfi, supra,* 25 Cal.App.3d at p. 689; see also *Schroeder* v. *Auto Driveaway Co., supra,* 11 Cal.3d at p. 922; *Oakes* v. *McCarthy Co.,* 267 Cal.App.2d 231, 263 [73 Cal.Rptr. 127]; 4 Witkin, Summary of Cal. Law (8th ed.) p. 3156.) Here, the ratio of punitive damages to compensatory damages is in excess of 14 to 1 and in dollar amount the punitive damage award exceeds the compensatory award by almost two and a third million dollars.

---

[5]Plaintiff would compare the punitive damage award with defendant's gross assets and/or gross income. We do not find comparison to these gross figures meaningful. Gross assets might be very substantial but if liabilities are even greater, the company would be insolvent. Similarly, gross income might be very large, but if expenses are even larger, the company would be incurring a loss. It is the net figures with which comparison should be made.

We conclude that the punitive damage award is so excessive and grossly disproportionate to the wealth of defendant and to the compensatory damages awarded that it is suggestive of passion and prejudice. Having so concluded, there are several alternative dispositions we may make. (See *Cunningham* v. *Simpson, supra,* 1 Cal.3d at p. 310.) We believe justice will be best served in this case by reversing on the issue of the amount of punitive damages only, on condition that if plaintiff agrees to remit all of the punitive damage award except the sum of $250,000, the judgment is modified accordingly and affirmed as modified. (*Id.*; see also *Stevens* v. *Snow,* 191 Cal. 58, 68 [214 P. 968]; *Simoneau* v. *Pacific Electric Ry. Co.,* 166 Cal. 264, 279 [136 P. 544]; *Salstrom* v. *Orleans Bar Gold Min. Co.,* 153 Cal. 551, 559 [96 P. 292].)

3. *Jurisdiction to Award Punitive Damages in Excess of the Amount Prayed for*

Plaintiff originally prayed for $250,000 punitive damages. The court subsequently granted plaintiff's motion to amend, first to increase the prayer to $1 million and then to amend to conform to proof. However, no such amendment was ever actually made. Defendant contends that, even where a case has been fully tried, the court is without jurisdiction to award damages in excess of the amount prayed for. (E.g., *Meisner* v. *McIntosh,* 205 Cal. 11, 13 [269 P. 612]; *Frost* v. *Mighetto,* 22 Cal.App.2d 612, 616-617 [71 P.2d 932]; see *Singleton* v. *Perry,* 45 Cal.2d 489, 499-500 [289 P.2d 794]; *Leo* v. *Dunlap,* 260 Cal.App.2d 24, 28 [66 Cal.Rptr. 888]; cf. Code Civ. Proc., § 580; contra: *Vaughn* v. *Jonas,* 31 Cal.2d 586, 605-606 [191 P.2d 432]; *Barber* v. *LeRoy,* 40 Cal.App.3d 336, 345-346 [115 Cal.Rptr. 272]; *Oakes* v. *McCarthy, supra,* 267 Cal.App.2d at p. 264; *Voy* v. *Shelley,* 177 Cal.App.2d 132, 133-135 [1 Cal.Rptr. 859].) In view of our disposition it is unnecessary for us to resolve this issue. If plaintiff agrees to remit, the punitive damages recovered will not be in excess of the amount prayed for. If plaintiff declines to remit, the case will be remanded to the superior court for new trial on the issue of the amount of punitive damages at which time the trial court may in the exercise of its judicial discretion permit an amendment to the amount prayed for by plaintiff as punitive damages.

*Disposition*

The judgment is affirmed in all respects except as to the award of punitive damages. The award of punitive damages is reversed and

remanded for retrial on the issue of the amount of punitive damages, unless plaintiff shall, within 15 days from the date this opinion is filed, file with the clerk of this court and serve upon defendant plaintiff's written consent to a reduction of the punitive damage award to the sum of $250,000, in which event the judgment is modified to award plaintiff punitive damages in the amount of $250,000 and in which event the judgment is affirmed in its entirety as modified. If plaintiff shall agree to remit as herein provided, the parties shall bear their own respective costs on appeal. Otherwise defendant shall recover costs on appeal.

Gardner, P. J., and Morris, J., concurred.

A petition for a rehearing was denied March 14, 1977.