Ronald O. **PHELPS** and Donna **Phelps, Plaintiffs,**

v.

**PROVIDENT LIFE AND ACCIDENT INSURANCE COMPANY, and Does 1 through 100, inclusive, Defendants.**

No. CV 98–7362 DT VAPX.

United States District Court, C.D. California.

Aug. 2, 1999.

ORDER GRANTING DEFENDANT PROVIDENT
LIFE AND ACCIDENT INSURANCE
COMPANY'S MOTION FOR SUMMARY
ADJUDICATION OF ISSUES

TEVRIZIAN, District Judge.

## I. *Background*

### A. Factual Summary

This action is brought by Plaintiffs Ronald O. Phelps and Donna Phelps ("Plaintiffs") against Defendant Provident Life and Accident Insurance Company ("Defendant") for breach of contract, implied covenant of good faith and fair dealing, intentional infliction of emotional distress, negligence and declaratory relief.

The following facts are undisputed:

Plaintiff Ronald O. Phelps ("Phelps") was issued policy number 6PC–379835 ("Policy") effective June 28, 1979. To be entitled to total disability benefits under the Policy, Phelps needed to become "totally disabled" as that term is defined in the Policy. The Policy defines "total disability" to include, among other things, an inability to perform the substantial and material duties of Phelps' occupation as a chiropractor. The Policy contains a 30–day waiting period with respect to each disability claim and provides for the increase in monthly benefits for each individual disability claim on an annual basis based upon Cost of Living Adjustments ("COLA"). The base monthly benefit under the Policy is $2,180 plus COLA compounding on each individual disability claim. Phelps submitted a disability claim to Defendant in 1980 after allegedly suffering a slip and fall accident at a gas station which resulted in head trauma. Defendant paid Phelps his disability claim until June,

1997, at which time it concluded that Phelps was not totally disabled from his occupation as a chiropractor pursuant to the terms of the Policy.

### B. Procedural Summary

On June 5, 1998, Plaintiffs filed their Complaint in the Superior Court of California for the County of Orange. On September 10, 1998, Defendant filed a Notice of Removal based on diversity (28 U.S.C. § 1332(a)). On September 24, 1998, Defendant filed an Answer to Complaint.

At the Mandatory Status Conference, this Court set the discovery cut-off date of May 14, 1999 the pre-trial conference date of June 21, 1999, which was subsequently continued to September 7, 1999, and the trial date of August 3, 1999, which was subsequently continued to November 2, 1999.

On April 30, 1999, Defendant filed a Motion for Summary Adjudication of Issues, which is currently before this Court.

### II. *Discussion*

#### A. *Standard*

Under the Federal Rules of Civil Procedure, summary judgment is proper only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party has the burden of demonstrating the absence of a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). If the moving party satisfies the burden, the party opposing the motion must set forth specific facts showing that there remains a genuine issue for trial. *Id.*; *see* Fed.R.Civ.P. 56(e).

A non-moving party who bears the burden of proof at trial to an element essential to its case must make a showing sufficient to establish a genuine dispute of fact with respect to the existence of that element of the case or be subject to summary judg-

ment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Such an issue of fact is a genuine issue if it reasonably can be resolved in favor of either party. *Anderson*, 477 U.S. at 250–51, 106 S.Ct. at 2511. The non-movant's burden to demonstrate a genuine issue of material fact increases when the factual context renders her claim implausible. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Thus, mere disagreement or the bald assertion that a genuine issue of material fact exists no longer precludes the use of summary judgment. *Harper v. Wallingford*, 877 F.2d 728 (9th Cir.1989); *California Architectural Building Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir.1987), *cert. denied*, 484 U.S. 1006, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988).

### B. *Plaintiffs' Objections to Evidence*

1. Plaintiffs object to the copies of the surveillance films compiled by Defendant on the grounds that they are not properly authenticated, irrelevant and inadmissible hearsay. This Court overrules said objections. With respect to their relevance and hearsay objections, Plaintiffs fail to support said objections. With respect to their authentication objections, contrary to Plaintiffs' misrepresentation of the law, a Court can infer a declarant's personal knowledge and competence to testify from her position and the nature of her participation in the matters to which she swore. *Barthelemy v. Air Lines Pilots Ass'n*, 897 F.2d 999, 1018 (9th Cir. 1990). In this case, the declarant handles claims for Defendant and was personally involved with the handling of Phelps' disability insurance claim at issue.

2. Plaintiffs object to the cases and motions attached to Defendant's Motion for Summary Adjudication and to an unpublished case in Exhibit C on the grounds that they are not properly authenticated, irrelevant and inadmissible hear-

say. A ruling on these objections is not necessary. To the extent that this Court has relied on any of these cases in its analysis, below, this Court takes judicial notice of said cases pursuant to Federal Rule of Evidence 201.

 3. Plaintiffs object to the transcripts of surveillance films compiled by Defendant on the grounds that they are not properly authenticated, irrelevant and inadmissible hearsay. This Court overrules said objections. With respect to their relevance and hearsay objections, Plaintiffs fail to support said objections. With respect to their authentication objections, contrary to Plaintiffs' misrepresentation of the law, a Court can infer a declarant's personal knowledge and competence to testify from her position and the nature of her participation in the matters to which she swore. *Barthelemy v. Air Lines Pilots Ass'n*, 897 F.2d 999, 1018 (9th Cir. 1990). In this case, the declarant handles claims for Defendant and was personally involved with the handling of Phelps' disability insurance claim at issue.

 4. Plaintiffs object to Defendant's Exhibit Z, a memorandum of a telephone conversation, on the grounds that it is not properly authenticated, irrelevant and inadmissible hearsay. This Court overrules said objections. With respect to their relevance and hearsay objections, Plaintiffs fail to support said objections. With respect to their authentication objections, contrary to Plaintiffs' misrepresentation of the law, a Court can infer a declarant's personal knowledge and competence to testify from her position and the nature of her participation in the matters to which she swore. *Barthelemy v. Air Lines Pilots Ass'n*, 897 F.2d 999, 1018 (9th Cir. 1990). In this case, the declarant handles claims for Defendant and was personally involved with the handling of Phelps' disability insurance claim at issue. Moreover, the declarant in this case participated in the telephone conversation which she was memorializing.

## C. *The Parties' Factual Summaries*

At the outset, this Court sets forth the parties' factual summaries.

### 1. Facts according to Defendant

As part of its investigation, and while continuing to regularly pay Phelps' claim, Defendant had a private investigator follow Phelps in July 1990. That surveillance showed Phelps moving about seemingly in a normal fashion, walking rather briskly, doing repairs with both limbs on his recreation vehicle, doing gardening work, and otherwise engaging in activities seemingly inconsistent with his disabling claim. Defendant then had the records and surveillance film reviewed by its medical director, Dr. Charles Leagus, who opined that the surveillance film was not consistent with Phelps' disability claim. As the result of the surveillance and Dr. Leagus' report, Defendant elected to have Phelps undergo an independent medical examination ("IME") with Dr. Seth Weingarten. The IME took place on August 6, 1991. In his two reports, Dr. Weingarten expressed severe skepticism with respect to Phelps' credibility, and he suggested further testing and examination take place. The claim handler at Defendant, however, did not follow through, and the claim continued to be paid regularly for several years without further significant investigation.

In August of 1996, Defendant elected to have Phelps again followed by a private investigator. The surveillance film again showed Phelps moving about apparently unaffected by complaints of pain, lifting objects with both limbs, and spending time on his 50-foot yacht. Thereafter, Defendant elected to again have Phelps examined by Dr. Weingarten. Dr. Weingarten's January 1997 IME report was again strongly critical of Phelps' disability claim. Dr. Weingarten again, however, indicated that he needed additional information before he could reach a conclusion with respect to Phelps' total disability status, requesting specifically that he view records concerning the alleged 1980 accident and

medical treatment and that he be provided with a more detailed job description. By March 17, 1997, Dr. Weingarten had been provided with this additional information from Defendant, and he indicated that Phelps had fully recovered from his neurological injury and that he could return to work as a chiropractor despite his alleged neurological problems. Dr. Weingarten did suggest, however, that Defendant should analyze Phelps' alleged ophthalmologic problems to see if they resulted in a total disability.

Defendant had Phelps' ophthalmologic records examined by Dr. Deborah DiStefano, a board certified ophthalmologist. Dr. DiStefano concluded that the records did not suggest any objective problems relating to his eye condition, and that there were no restrictions on bending or lifting associated with his eye condition. Also in May 1997, Defendant conducted a third session of videotaped surveillance, which again showed Phelps moving about rather effortlessly, lifting objects, and spending time aboard his yacht. Consequently, on June 10, 1997, Defendant sent a letter to Phelps closing his disability claim based upon Defendant's conclusion that Phelps was no longer totally disabled from his occupation as the result of his alleged conditions.

On July 9, 1997, Phelps' attorney sent Defendant a letter criticizing Defendant's claim decision and requesting that Defendant send him copies of all materials upon which Defendant relied to terminate benefits. On November 4, 1997, after Defendant had sent him Dr. Weingarten's reports, Phelps' counsel wrote Defendant a letter attaching additional medical reports form four separate doctors in support of Phelps' disability claim. On November 19, 1997, Defendant had these records reviewed by its medical director, who suggested that all of the records be again referred to Dr. Weingarten for his review and response. On December 4, 1997, Dr. Weingarten provided Provident with a response indicating that his opinions remained as stated in his prior reports issued to Defendant. His report did indicate, however, that a new condition had apparently developed, avascular necrosis of the hips, since Dr. Weingarten's last examination. Phelps directly sent Defendant on December 10, 1997, various memoranda and records in support of his disability claim, including his new diagnosis of avascular necrosis of both hips.

On January 9, 1998, Defendant had a conversation with Dr. Weingarten wherein Dr. Weingarten again confirmed that the avascular necrosis condition was a new condition which did not exist when he examined Phelps in January 1997. As a result, Defendant sent Phelps' attorney a letter indicating that Defendant stood by its decision with respect to Phelps' claim on his express conditions as they existed at the time of Weingarten's examination but invited Phelps to submit a new claim form based upon avascular necrosis to identify when it arose, who was treating it, etc.

Around February 27, 1998, Defendant received a letter from Phelps' counsel taking issue with Defendant's position and indicating that unless all benefits were paid by March 13, 1998, this lawsuit would be filed and served. On March 10, 1998, Defendant sent Phelps' attorney a letter reiterating its position that it did not believe Phelps to be disabled from his original conditions, but that it was willing to analyze the avascular necrosis claim if Phelps would complete previously given claim forms on this condition. On March 23, 1998, Defendant, without receiving claim forms, elected to again resume payment of Phelps' disability claim beginning October 10, 1997 (the date that Phelps' avascular necrosis was diagnosed by his doctors), less a new 30–day elimination period. Defendant's letter dated March 23, 1998 to Phelps' attorney again requested Phelps to fill out claim forms on this specific condition.

Defendant has continued to pay Phelps monthly disability benefits based upon his avascular necrosis condition during this lawsuit, and thus the only months for which benefits were unpaid are between

June 9, 1997 and November 10, 1997. To date, Defendant has paid Phelps over $725,000 in benefits.

## 2. Facts according to Plaintiffs

In his April 13, 1991 assessment of the records, Dr. Weingarten did not comment on all of the injuries which comprised Phelps' claim of total disability. He narrowly addressed only one injury, the brain stem contusion. Dr. Weingarten, without additional testing, was unable to "objectively define" the extent of Phelps' disability. In his report following the IME, Dr. Weingarten did not make any determination regarding disability. He recommended eight additional tests and evaluations in order to determine Phelps' disability. Defendant never followed through with Dr. Weingarten's recommendations.

In 1997, Defendant elected to have Phelps examined by Dr. Weingarten a second time. In his January 8, 1997 letter, Dr. Weingarten made clear that he was unable to comment upon Phelps' disability without additional information relating to the physical demands of the patient's work. Dr. Weingarten then reviewed a description of Phelps' work and an MRI of Phelps' lumbar spine. None of the previously recommended testing or evaluations by other disciplines was undertaken. Phelps was not examined by any other physicians on behalf of Defendant. In stating that Phelps has fully recovered, Dr. Weingarten was addressing only the cerebral concussion and lumbar/cervical sprain, not the other injuries or conditions, such as the "very marked" hypertension.

Defendant's only attempt to seek additional input on Phelps' condition was to send his ophthalmologic records to Dr. DiStefano. Dr. DiStefano never examined Phelps nor spoke to him about his condition. Dr. DiStefano concluded that a medical examination was indicated in order to test visual field to determine the reasons "why he can't do his job." This test was never undertaken, and Dr. DiStefano never concluded that Phelps was not disabled from performing his job.

In response to Defendant's decision, on July 1, 1997, J. William Scheppach, M.D., Phelps' treating internist since the original injury in 1980, sent a detailed report to Sally Moore, the claim representative for Defendant. In his report, Dr. Scheppach specifically states that Phelps remains disabled from a number of medical problems including back problems which require surgical intervention, markedly fluctuating blood pressure which could be fatal and his brain stem injury which results in episodic nausea and projectile vomiting.

Further, in November 1997, Phelps' counsel sent Ms. Moore three additional medical reports and an MRI of October 1997, indicating that Phelps was disabled from a variety of medical problems, one of which was avascular necrosis ("AVN"). Ms. Moore's response of December 10, 1997 was to deny benefits. Defendant admitted they were advised by Dr. Weingarten on December 4, 1997 that Phelps had AVN, yet benefits were not reinstituted and would not be for another four months.

On December 10, 1997, Phelps resubmitted the exact same medical reports to Ms. Moore that his counsel had previously sent. On January 13, 1998, Ms. Moore advised that the "new information" submitted by Phelps showed a new injury to his wrist and hips and invited him to submit a new claim form.

On February 27, 1998, Phelps' counsel sent a letter to Ms. Moore advising that the information sent to her was not "new;" Defendant had known about and had documentation of the hip pain and injury to the wrist of Phelps' major hand for over fifteen years. Further, the MRI, which she stated showed evidence of a new injury, had been sent to her the previous November when she had continued to deny benefits. Phelps' treating orthopedist, Dr. Prietto, believed the AVN was developing for four to five years before the diagnosis in 1997. Phelps' counsel then demanded that benefits be reinstituted retroactively to June 9, 1997.

The benefits were finally instituted in April 1998, not at $4,132 but rather at a reduced payment of $2,180 per month for the "new" injury, but only paid four months of benefits because of the 30–day waiting period. Recently, on June 7, 1999, Defendant, acknowledging the need for further study, demanded that Phelps submit to an examination by an orthopedist, Dr. Segil, to study the AVN. There has been no explanation offered why such an examination was not performed prior to the denial or change of benefits despite the fact that Defendant had been "considering" an orthopedic examination since 1991.

The financial losses incurred by Plaintiffs include six months of unpaid benefits amounting to $24,792 and the past differential between the two monthly benefits payments amounting to $29,250 and continuing into the future. Further, because of Defendant's determination that Phelps' "new" disability occurred after the age of 50, the current benefits will terminate at age 65 instead of upon death which amounts to a loss of $595,000 assuming that Phelps has a normal life expectancy of 21 years.

### D. *Analysis*

### 1. Defendant Is Entitled to Summary Adjudication of Plaintiffs' Causes of Action for Bad Faith and Negligence

█ Defendant seeks summary adjudication of Plaintiffs' causes of action for breach of the implied covenant of good faith and fair dealing and negligence claiming that a dispute regarding its liability existed at the time it terminated Plaintiff's disability claim effective June 1997. It contends that at the time of the filing of this lawsuit, benefits were unpaid for only five months due to Defendant's determination that Phelps' old claim had closed and a new alleged disability symptom had surfaced. It asserts that a "genuine dispute" existed as a matter of law concerning whether Phelps was entitled to benefits during the five-month window in dispute given the surveillance films, the examination reports from Dr. Weingarten, the rec-

ord review from Dr. DiStefano and the review by Dr. Leagus. It claims that in short, credible evidence existed that Phelps was not entitled to benefits during the five-month window in dispute. Defendant further states that although Phelps and his doctors claim that he is entitled to benefits during the five-month window in dispute and that no "new claim" occurred, a "genuine issue" as to Defendant's continuing liability under the terms and conditions of the insuring agreement certainly existed and still exists and therefore Defendant cannot be held liable for bad faith as a matter of law for electing not to pay those benefits.

█ Under California law, all insurance contracts contain an implied covenant of good faith and fair dealing. *Egan v. Mutual of Omaha Insurance Co.* (1979) 24 Cal.3d 809, 818, 169 Cal.Rptr. 691, 620 P.2d 141. An insurer may breach this covenant when it fails properly to investigate its insured's claim, or when it refuses, without proper cause, to compensate its insured for a loss covered by the policy. *Hanson v. Prudential Insurance Company of America,* 783 F.2d 762, 766 (9th Cir.1985) (citing California law).

█ However, under California law, an insurer cannot be found liable for breach of the implied covenant of good faith and fair dealing unless it is found to have withheld benefits unreasonably. *Tomaselli v. Transamerica Insurance Company* (1994) 25 Cal.App.4th 1269, 1281, 31 Cal.Rptr.2d 433. Even then, "the mistaken withholding of policy benefits, if reasonable or if based on a legitimate dispute as to the insurer's liability under California law, does not expose the insurer to bad faith liability." *Id.* at 1281, 31 Cal.Rptr.2d 433. In other words, an insurer does not act in bad faith by denying a claim where the insurer's denial of a claim is not unreasonable. *Opsal v. United Services Automobile Association* (1991) 2 Cal.App.4th 1197, 1205, 10 Cal.Rptr.2d 352. "[B]efore an insurer can be found to have acted tortiously, i.e., in bad faith, in refusing to bestow policy benefits, it must have done

so 'without proper cause.'" *California Shoppers, Inc. v. Royal Globe Insurance Company* (1985) 175 Cal.App.3d 1, 54–55, 221 Cal.Rptr. 171.

 The Ninth Circuit has confirmed that the denial of benefits alone does not demonstrate bad faith. *Hanson v. Prudential Insurance Company of America*, 783 F.2d 762, 766 (9th Cir.1985). As indicated, the withholding of benefits must be "unreasonable" or "without proper cause." It is not unreasonable for an insurer to resolve good faith doubts about the claim against the claimant. *See Blake v. Aetna Life Insurance Company* (1979) 99 Cal.App.3d 901, 924, 160 Cal.Rptr. 528. A court can conclude as a matter of law that an insurer's denial of a claim is not unreasonable, even if the court concludes the claim is payable under the policy terms, so long as there existed a genuine issue as the insurer's liability. *Franceschi v. American Motorists Ins. Co.*, 852 F.2d 1217, 1220 (9th Cir.1988).

This Court concludes that a genuine issue existed as to Defendant's continuing liability under the terms and conditions of the insuring agreement regarding payment of Phelps' disability claim. First, Defendant had obtained a significant amount of videotape footage showing Phelps engaging in activities inconsistent with his statements in his disability claim. (*See* Moore Decl., Exhs. G and L.) Based on the surveillance film in August of 1996, Defendant elected to have Phelps independently examined by Dr. Weingarten. (*See id.* at Exh. M.) This examination was recorded by a court reporter at Phelps' request and with his attorney present. (*See id.* at Exh. N.) Dr. Weingarten's January 1997 IME report was strongly critical of Phelps' disability claim. Because Dr. Weingarten indicated that he needed additional information before he could reach a conclusion with respect to Phelps' total disability status, Dr. Weingarten had been provided with this additional information from Defendant, and he indicated that Phelps had fully recovered from his neurological injury and that he could return to work as a

chiropractor despite his alleged neurological problems. (*See id.* at Exh. O.) Dr. Weingarten did suggest, however, that Defendant should analyze Phelps' alleged ophthalmologic problems to see if they resulted in a total disability. (*See id.* at Exh. P.) As a result, Defendant had Phelps ophthalmologic records examined by Dr. Deborah DiStefano, a board certified ophthalmologist. (*See id.* at Exh. Q.) Dr. DiStefano concluded that the records did not suggest any objective problems relating to his eye condition, and that there were no restrictions on bending or lifting associated with his eye condition. (*See id.*) Also in May 1997, Defendant conducted a third session of videotaped surveillance, which again showed Phelps moving about rather effortlessly, lifting objects, and spending time aboard his yacht. (*See id.* at Exhs. G and R.) In light of the above evidence which was before Defendant, it is clear that Defendant had sufficient reasons to question its liability with respect to Phelps' disability claim. Consequently, on June 10, 1997, Defendant sent a letter to Phelps closing his disability claim based upon Defendant's conclusion that Phelps was no longer totally disabled from his occupation as the result of his alleged conditions. (*See id.* at Exh. S.)

Plaintiffs first argue that based on the state of the medical evidence that existed at the time of the denial, it is clear that Defendant relied entirely on information furnished by its doctors and disregarded the medical reports provided by the insured's doctors indicating he was in fact disabled. This Court disagrees. The examination and report was the result of an independent medical examination. In addition, Defendant had Phelps' doctors' reports reviewed by Dr. Weingarten who responded that his opinions remained the same. While Plaintiffs make the unsupported assertion that Defendant did not consider his own doctors' reports, Plaintiff does not dispute the accuracy or reliability of the independent medical examination. Thus, while Plaintiffs dispute the results of the examinations, it is clear that a genuine issue regarding Defendant's continuing lia-

bility under the terms and conditions of the insuring agreement existed based on Defendant's investigation and reports.

Plaintiffs next argue that Dr. Weingarten's opinion is not supported by objective medical findings because Defendant failed to undertake any of the previously recommended tests to objectively evaluate Phelps' disability status. Those previously recommended tests were a result of Dr. Weingarten's independent medical examination and reports in 1991. Defendant admits that it failed to follow through with these recommendations. The basis for the decision in dispute, however, was the 1997 independent medical examination and report. Dr. Weingarten did request, and received, additional information; however, this information did not include the tests which were requested in 1991. Thus, the fact that Defendant failed to undertake those tests is not relevant to the current determination.

Plaintiffs next contend that the fact that Dr. Weingarten failed to even measure Phelps' blood pressure in 1997 despite the fact that it was the only significant finding in the 1991 report raises a triable issue as to whether the independent medical report certifying that Phelps had recovered from his neurological injuries contains an accurate evaluation of Phelps' health. The problem with this contention is the same as with the contention, above. This "significant finding" was made in 1991; Defendant's determination that Phelps was no longer disabled was as a result of the examination and reports in 1997. Thus, this fact is irrelevant.

Plaintiffs finally argue that a triable issue of material fact exists as to the claims of breach of good faith and fair dealing because Defendant unreasonably withheld the benefits before ruling out each injury which forms a separate basis for total disability. In support of this argument, Plaintiffs rely on an insurer's duty to thoroughly investigate an insured's claim as set forth in *Egan v. Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809, 819, 169 Cal.Rptr. 691, 620 P.2d 141. In *Egan*, the insured was seeking damages for breach of a disability insurance contract from the insurer and its claims representatives. The Supreme Court held that an insurer may breach the covenant of good faith and fair dealing when it fails to properly investigate its insured's claim. *Id.* at 817, 169 Cal.Rptr. 691, 620 P.2d 141. In *Egan*, the Court found that the trial court did not err in directing a verdict on the issue of the breach of the implied covenant since the evidence was undisputed that the insurer failed to properly investigate plaintiff's claim. *Id.* at 819, 169 Cal.Rptr. 691, 620 P.2d 141. Specifically, the trial court, in directing a verdict against defendants, ruled as a matter of law that defendants' failure to have plaintiff examined by a doctor of their choice or to consult with plaintiff's treating physicians and surgeon violated the covenant of good faith and fair dealing. *Id.* at 817, 169 Cal.Rptr. 691, 620 P.2d 141.

■ Thus, while it is true that failure to properly investigate a claim may give rise to a breach of the covenant of good faith and fair dealing, this principle is not applicable in this case. Plaintiffs states that Defendant failed to investigate Phelps' claim thoroughly by failing to conduct a multitude of tests, including MRIs, and to repeat previous testing. That Defendant did not exhaust all possible tests is not dispositive. Indeed, an insured would always be able to argue that something else should have been done. Here, it is undisputed that Defendant had arranged for, and completed, an independent medical examination. Phelps submitted medical reports from four separate doctors which were reviewed by its medical director and then referred to Dr. Weingarten for his review and response. "The insurer must of course consider the interests of its insured, but it is also entitled to give its own interests consideration." *Tomaselli*, 25 Cal.App.4th at 1281, 31 Cal. Rptr.2d 433. Plaintiffs also make much of the fact that none of the doctors relied on by Defendant ever determined that Phelps was totally disabled. However, such a statement by the doctors is not necessary.

This specific determination, which is guided by the Policy, needs to be made only by Defendant based on the findings of the doctors that Phelps was able to perform certain functions in his occupation. As such, this Court concludes that Defendant did not fail to properly investigate Phelps' claim as set forth in *Egan*. To put it distinctly, there isn't as a matter of law any arbitrary of capricious conduct on the part of the insurer in this case to constitute the breach of the covenant of good faith and fair dealing.

Moreover, the underlying policy considered by the *Egan* Court has been satisfied here. The *Egan* Court stated that the purchase of disability insurance provides peace of mind and security in the event the insured is unable to work. *Id.* at 819, 169 Cal.Rptr. 691, 620 P.2d 141. "To protect these interests it is essential that an insurer fully inquire into possible bases that might support the insured's claim." *Id.* In this case, Defendant has done just that. As a result of his review of Phelps' medical reports from four separate doctors, Dr. Weingarten reported that a new condition had apparently developed, avascular necrosis of the hips, since Dr. Weingarten's last examination. (*See* Moore Decl., Exh. W.) On January 9, 1998, Defendant had a conversation with Dr. Weingarten wherein Dr. Weingarten again confirmed that the avascular necrosis condition was a new condition which did not exist when he examined Phelps in January 1997. (*See id.* at Exh. Z.) As a result, Defendant sent Phelps' attorney a letter inviting Phelps to submit a new claim form based upon avascular necrosis. (*See id.* at Exh. AA.) On March 10, 1998, Defendant sent Phelps' attorney a letter reiterating its position that it did not believe Phelps to be disabled from his

original conditions, but that it was willing to analyze the avascular necrosis claim if Phelps would complete previously given claim forms on this condition. (*See id.* at Exh. CC.) On March 23, 1998, Defendant, without receiving claim forms, elected to again resume payment of Phelps' disability claim, less a new 30–day elimination period, and again requested Phelps to fill out claim forms on this specific condition. (*See id.* at Exh. DD.) Defendant has continued to pay Phelps monthly disability benefits based upon his avascular necrosis condition during this lawsuit.[1] Thus, Defendant's conduct can hardly be said to be a violation of the implied covenant of good faith and fair dealing.

In sum, Defendant has established that a legitimate dispute existed as to its liability during the time when the benefits were unpaid.[2] Plaintiffs have not offered sufficient evidence from which a reasonable juror could infer that Defendant acted unreasonably in concluding that Phelps was no longer disabled. In light of the above, since no triable issue of material fact exists, this Court concludes that Defendant's denial of Phelps' claim was not unreasonable or without proper cause as a matter of law. Accordingly, this Court **grants** Defendant's motion for summary adjudication as to the second cause of action for breach of the implied covenant of good faith and fair dealing and the fourth cause of action for negligence.

**2. Defendant Is Entitled to Summary Adjudication of Plaintiffs' Cause of Action for Intentional Infliction of Emotional Distress**

Defendant contends that no facts exist establishing that it acted with extreme and outrageous conduct. It states

1. In its reply, Defendant states that a recent examination paid for by Defendant has shown that the AVN diagnosis is wrong and that the condition is certainly not disabling. It states that it continues to pay benefits under a reservation of rights.

2. As Defendant correctly points out, the merits of Phelps' disability claim will be addressed separately in Plaintiffs' cause of action for breach of contract. This cause of action—requiring a determination of whether Phelps is totally disabled under the Policy and entitled to benefits—is not at issue in this motion. At this time, this Court only addresses the issue of a breach of the implied covenant of good faith and fair dealing irrespective of the insurer's ultimate liability on the claim.

that it merely made a claim decision after receiving independent medical reports and reviewing surveillance film. Plaintiffs, on the other hand, contend that Defendant's actions in denying benefits are extreme and outrageous.

■■■■■ A prima facie case of intentional infliction of emotional distress requires (1) outrageous conduct by the defendant, (2) intention to cause or reckless disregard of the probability of causing emotional distress, (3) severe emotional suffering and (4) actual and proximate causation of the emotional distress. *Agarwal v. Johnson* (1979) 25 Cal.3d 932, 945, 160 Cal.Rptr. 141, 603 P.2d 58. The acts must be "so extreme as to exceed all bounds of that usually tolerated in a civilized community." *Schlauch v. Hartford Acc. & Indem. Co.* (1983) 146 Cal.App.3d 926, 936, 194 Cal. Rptr. 658. The conduct must be directed at plaintiff and be of a type that is "specially calculated to cause mental distress of a very serious kind." *Christensen v. Superior Ct.* (1991) 54 Cal.3d 868, 903, 2 Cal. Rptr.2d 79, 820 P.2d 181.

In support of its contention, Defendant argues that Plaintiffs' general allegations that Defendant's refusal to pay benefits under the disability policies do not allow them to recover tort damages. It claims that the facts in this case establish that it did not act with extreme and outrageous conduct. This Court agrees and concludes that Defendant's actions do not give rise to an intentional infliction of emotional distress claim as a matter of law.

Plaintiffs rely on the case of *Little v. Stuyvesant Life Ins. Co.* (1977) 67 Cal. App.3d 451, 461–62, 136 Cal.Rptr. 653, wherein the Court held that the defendant was guilty of outrageous conduct. However, the facts of the *Little* case are distinguishable. In *Little,* the Court found that "reasonable inferences may be drawn that defendant purposely ignored the great bulk of the medical information it had and withheld that information from the physicians it selected to examine plaintiff and that it sought only to justify its predetermined course of discontinuing disability benefit payments justly due plaintiff under the policy." *Id.* at 462, 136 Cal.Rptr. 653. Specifically, the facts provided as follows: the evidence that plaintiff was in fact totally disabled was overwhelming; the defendant employed a company to conduct an investigation into plaintiff's claim, and the resulting report tended to substantiate plaintiff's claim; the doctors employed by defendant to examine plaintiff did not know the physical activity work required for plaintiff's job; the doctors were not supplied with any of plaintiff's medical records or reports from plaintiff's treating physicians. *Id.* at 457, 459, 136 Cal.Rptr. 653.

In this case, none of Defendant's reports substantiated Phelps' claim. Dr. Weingarten's 1997 report did indicate that he needed additional information before he could reach a conclusion with respect to Phelps' total disability status; he specifically requested that he be provided with a more detailed job description. Dr. Weingarten had been provided with this additional information when he made his conclusion. Thus, this case is distinguishable from the *Little* case, and the facts here do not give rise to a reasonable inference that Defendant's conduct was extreme and outrageous.

In addition, Defendant made a decision not to pay benefits during a certain window of time, but it continued to pay benefits thereafter based on a new condition. This can hardly be said to be extreme and outrageous. Moreover, as set forth above, this Court has concluded that since a legitimate dispute existed as to Defendant's liability, Defendant's denial of Phelps' claim was not unreasonable or without proper cause as a matter of law. Accordingly, this Court **grants** Defendant's motion for summary adjudication as to Plaintiffs' third cause of action for intentional infliction of emotional distress.

### 3. Defendant Is Entitled to Summary Adjudication of Plaintiffs' Claim for Punitive Damages

■■■■ Defendant contends that it is entitled to summary adjudication as to

Plaintiffs' claim for punitive damages. By contrast, Plaintiffs contend that summary adjudication is improper since there is clear and convincing evidence that Defendant's denial of benefits was a result of malice, fraud or oppression.

California Civil Code Section 3294(a) provides as follows:

> In an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant.

Section 3294(c) defines "malice" and "oppression" in terms of "despicable conduct" carried out in "conscious disregard" of a person's rights. *See* Cal.Civ.Code § 3194(c).

 Plaintiffs claim that the facts indicate that Defendant relied only on information that supported its denial of benefits, disregarded information that supported the claim to pay benefits, failed to investigate information that would have supported a claim for disability benefits, and even went so far as to misrepresent the status of the medical evidence when concluding that Phelps' AVN was a "new" injury. As explained above, this Court disagrees with Plaintiffs' bald assertions. Since the facts of this case do not give rise to a breach of the duty of good faith and fair dealing, this Court cannot find that these same facts establish clear and convincing evidence of oppression, fraud or malice. Indeed, even when an insurer has violated its duty of good faith and fair dealing, an award of punitive damages is not automatic. As stated by the California Appellate Court:

> Evidence that an insurer has violated its duty of good faith and fair dealing does not thereby establish that it has acted with the requisite malice, oppression, or fraud to justify an award of punitive damages. (Citations omitted.) In order

to establish that an insurer's conduct has gone sufficiently beyond mere bad faith to warrant a punitive damage award, it must be shown by clear and convincing evidence that the insurer has acted maliciously, oppressively or fraudulently.

*Mock v. Michigan Millers Mutual Insurance Company* (1992) 4 Cal.App.4th 306, 328, 5 Cal.Rptr.2d 594. Similarly, in another case, *Tomaselli v. Transamerica Insurance Company* (1994) 25 Cal.App.4th 1269, 31 Cal.Rptr.2d 433, while the court found sufficient evidence to support the jury's finding of "bad faith," the court reversed the jury's award of punitive damages. It stated:

> [T]he actions of [the insurer] may be found to be negligent (failing to follow-up information provided by the insured), overzealous (taking an unnecessary deposition under oath of the insured), legally erroneous (relying on an endorsement which was not shown to have been delivered), and callous (failing to communicate). There was nothing done, however, which could be described as evil, criminal, recklessly indifferent to the rights of the insured, or with a vexatious intention to injure. There is simply no evidence supporting a punitive damage award in this case....

*Id.* at 1288, 31 Cal.Rptr.2d 433.

The conduct by Defendant in this case does not rise to the level of despicable conduct. Rather, it evidences an attempt by Defendant to investigate and resolve a dispute concerning its liability as to Phelps' disability claim. As such, this Court concludes as a matter of law that Plaintiffs have failed to establish clear and convincing evidence that Defendant has been guilty of oppression, fraud or malice entitling it to an award of punitive damages. Accordingly, this Court **grants** Defendant's motion for summary adjudication as to Plaintiffs' claim for punitive damages.

### E. *Conclusion*

For the foregoing reasons, this Court grants Defendant's Motion for Summary Adjudication of Issues.

**IT IS SO ORDERED.**