Filed 11/29/22  Hughes v. Boris CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| KENNETH B. HUGHES, | B306291 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BC594068) |
| v. | |
| GEORGE THEO BORIS et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Maureen Duffy-Lewis, Judge. Affirmed.

Prindle, Goetz, Barnes, & Reinholtz and Jack R. Reinholtz; Darius Asly for Defendants and Appellants.

Law Offices of Howard A. Kapp and Howard A. Kapp; Finnegan & Diba, Kasey Diba, and Matthew Sichi for Plaintiff and Respondent.

Kenneth B. Hughes (Hughes), a plastic surgeon, sued George Theo Boris (Boris), a fellow surgeon, for breach of contract, conversion, intentional interference with contractual relations, and defamation (among other things). A jury found in favor of Hughes and awarded him $3.4 million in compensatory and punitive damages. We consider Boris's various challenges to the judgment: (1) whether the trial court erred by allowing one of Hughes's damages experts to opine about the average price Hughes was paid for surgeries and another damages expert to assign lost profits from Hughes's corporation to Hughes individually, (2) whether the court erred in limiting evidence of malpractice claims asserted against Hughes that Boris was permitted to introduce, (3) whether substantial evidence supports the jury's award of emotional distress damages, (4) whether oral testimony about the content of patient consent forms was properly admitted and (5) whether damages awarded for intentional interference with contractual relations are excessive.

## I. BACKGROUND

In 2011, after completing a six-year residency and a one-year fellowship in plastic and cosmetic surgery at, respectively, the University of Kansas and Harvard University, Hughes moved to Los Angeles and began work for Boris, who operated an ambulatory surgery center, Boris Cosmetic. Under the terms of a written agreement drafted by Hughes, Hughes would provide Boris with cosmetic surgery services on an independent contractor basis for a period of three years in return for a salary that would grow over the course of the first year to $375,000.

Seven months after Hughes began working for Boris, the parties renegotiated their written agreement to reflect the

growth in Hughes's practice so that he would be paid at an annual rate of $550,000. The parties subsequently amended their agreement again so that Hughes was paid at a rate of $40,000 per month or $480,000 per year. Beginning in July 2014, Hughes directed Boris's bookkeeper to make all payments to a corporation he formed in December 2013: Elite Plastic Surgery, Inc. (Elite).

In September 2014, the parties orally agreed on a yet another change in the terms of Hughes's compensation because Hughes was performing the lion's share of the center's surgeries. Under the new arrangement, fees from patients seeking Hughes's services would be split evenly between the parties. Boris's share of the split fees was meant to compensate him for providing Hughes with access to the surgery center, its nurses, supplies, and administrative staff. A few months later, the parties revised the fee-splitting agreement so that Hughes received an increased share of the revenue (55/45).

In August 2015, as a result of ongoing disputes over compensation and the surgery center's loss of accreditation due to improper record-keeping, Hughes stopped working for Boris. The following month, Hughes sued Boris and various entities owned by Boris.

Hughes's operative complaint asserts 12 causes of action against Boris and the related defendants. In the main, the claims allege Boris failed to pay Hughes in accordance with their oral agreements; converted "before and after" photographs from Hughes's time at the University of Kansas and Harvard University by placing them on Boris's website without Hughes's permission; intentionally interfered with Hughes's contractual relations with patients; and defamed Hughes. The allegedly

3

defamatory statements did not refer to Hughes's corporation Elite—only to Hughes himself.

A significant portion of the 18-day trial on the operative complaint was devoted to testimony from Hughes and a number of current and former employees of the surgery center concerning a pattern of irregular business practices and record-keeping by Boris with regard to patient referrals, files, and payments. Hughes testified he found his patients were often redirected to other doctors at the center, he was denied credit for bringing patients to the center, and he was unable to calculate what Boris owed him by looking at patient files because some files were incomplete and other files were entirely missing.

A former medical assistant supported Hughes's testimony in this regard. The medical assistant explained patient intake forms were routinely altered so that they falsely credited Boris with patients brought in by Hughes. The assistant also revealed that Boris, unbeknownst to Hughes, regularly offered discounts to Hughes's patients if they agreed to have their surgery performed by a doctor at the center other than Hughes. Staff from the center also testified that patient files were often missing, incomplete, inaccurately reconstructed, and lacked proper documentation for cash payments and payments from patient credit agencies. Staff also testified that even after Hughes stopped working at the surgery center they were directed by Boris, or his son who managed the surgery center, not to tell Hughes's patients of his departure in order to retain them as patients of the center.[1]

_____

[1]    At trial, Boris conceded Hughes did at least half of the center's surgeries in 2014 and 2015. Staff from Boris's surgery

4

Hughes called two damages experts to testify at trial, and the proof of damages was influenced by the evidence presented (and just recounted) regarding the deficiencies and inaccuracies in the patient files. The first expert was David Nolte (Nolte), a certified public accountant who calculated the number of surgeries performed by Hughes during the relevant period.[2] A second expert, David Dass (Dass), a plastic surgeon who had worked at Boris Cosmetic during part of Hughes's tenure and later competed with Hughes for patients after leaving Boris Cosmetic, calculated an average price for each surgery identified by Nolte. Nolte relied on these average price numbers from Dass (plus Nolte's own count of the number of surgeries) to calculate the amounts owed to Hughes as a result of Boris's alleged breach of contract and Hughes's lost profits.

Boris presented testimony from a single damages expert at trial: Victoria Wilkerson, a certified public accountant. She assumed the patient files maintained by Boris were accurate and complete in arriving at her different damages calculation.

The trial jury, after four days of deliberations, returned a verdict in favor of Hughes on several causes of action. The jury awarded Hughes $3,275,752 in compensatory damages: $511,284 for breach of contract or quantum meruit; $1,681,696 for lost profits; $422,000 in emotional distress damages; and $660,772 for

---

center estimated Hughes performed more than half of the center's surgeries.

[2]     Although Nolte reviewed various financial and patient records from the surgery center, he ultimately did not rely on them; instead, he relied on a surgery log.

loss of reputation and harm to business.[3]  The following day, after hearing testimony from Boris and his accountant, the jury also awarded Hughes $150,000 in punitive damages.

Boris then moved for a new trial or, in the alternative, for judgment notwithstanding the verdict.  Among other things, he argued the testimony of Hughes's damages experts was improper and unsupported, his defense to Hughes's defamation cause of action was handicapped by the trial court's pre-trial rulings refusing to permit him to present evidence that malpractice claims had been made against Hughes, and the amount of the verdict was excessive.

The trial court denied Boris's motion.  With regard to the size of the damage award, the court found "the jury properly arrived at the damages figure not by resort to chance as a result of juror fatigue, but as a result of careful consideration and deliberation"; in the court's view, "[w]hile the jury's decision in this case was on the high side, it does not reach the level required by case law to be taken away."  In denying the request for judgment notwithstanding the verdict, the court stated "it cannot be said that the decisions made by the jury and their resulting verdict are not supported by substantial evidence . . . [ ]or reasonable inferences made from that evidence."

## II.  DISCUSSION

Boris's various arguments for reversal are unavailing.  The trial court did not abuse its discretion in admitting Dass's opinion testimony regarding the average price of Hughes's surgeries

---

[3]     The special verdict form did not allocate damage amounts to individual causes of action.

6

because the opinion was based on sound reasoning from reliable material, including Dass's experience as a similarly-situated surgeon in Los Angeles. Nolte's assignment of Elite's lost profits to Hughes was consistent with the facts and applicable legal principles because the gist of the operative complaint involved alleged wrongs arising out of duties owed by Boris to Hughes individually, not to his corporation. The court did not err in excluding, as unduly prejudicial and confusing, evidence that malpractice claims had been made against Hughes when those claims were either dismissed or found to be unsubstantiated and where the court nonetheless permitted some inquiry into complications suffered by Hughes's patients during his tenure at Boris Cosmetics. The jury's award of emotional distress damages was supported by Hughes's testimony that he felt violated and depressed by Boris's misconduct, testimony that the jury and the trial court found credible. Finally, because Boris failed to object to Hughes's oral testimony about the patient consent forms for the before and after photographs and because he did not request a special verdict form that assigned or apportioned damages for each cause of action, his arguments on both of these grounds on appeal are forfeited.[4]

---

[4] Hughes has invited us to sanction Boris for inaccurate citations to the record and for a purportedly misleading summary of the proceedings in the trial court. We do not believe sanctions are warranted, in part due to correction of some matters in Boris's reply brief. Boris, in turn, asks us to sanction Hughes for making a frivolous request for sanctions. We decline to do that too. "The parties are advised to chill." (*Mattel, Inc. v. MCA Records* (9th Cir. 2002) 296 F.3d 894, 908.)

7

*A. The Trial Court Did Not Err by Admitting Dass's Testimony about the Average Price of Hughes's Surgeries*

*1. Additional background*

In advance of trial, Boris moved to exclude Dass's expert damages testimony. Boris maintained Dass's proposed testimony about the average price of surgical procedures performed by Hughes lacked a proper foundation because Dass did not review any of the pertinent materials—e.g., patient files—relating to the actual prices charged by Hughes. Hughes opposed the motion, arguing Dass could not rely meaningfully on the patient files because Boris failed to maintain those records so that they were both complete and accurate. Instead, in Hughes's view, the best Dass could do under the circumstances was to adopt a market-based approach to valuing the surgeries. The trial court's tentative ruling was that Dass's proposed testimony was too speculative to be admissible.

At trial, however, and after having heard some of the testimony about the unreliability of Boris's patient records, the trial court denied Boris's motion to exclude Dass's testimony (though allowing that the decision was a "very, very close call"). The court ruled the testimony would be admitted but cautioned that Dass's reliance on market data and his purported failure to review patient files, would be "fine fodder for cross-examination."

Dass went on to testify he worked for Boris for 11 months during 2011-2012 and Hughes recruited him to join Boris. Previously, Hughes and Dass had trained together at the University of Kansas. During his tenure at Boris's surgery center, Dass acquired a "firm understanding" of the prices charged by Boris for various surgeries. After leaving Boris's

8

employ, Dass went into private practice in Beverly Hills, but on occasion provided Boris with further services, including peer review.

Dass explained that because a large majority of cosmetic surgery patients are quite "savvy" with regard to pricing and "shop around" for a surgeon, he was familiar with the prices charged by other competing surgeons—including Hughes, whom he considered to be his principal competitor. In order to remain competitive in the price-sensitive market of cosmetic plastic surgery, Dass would independently verify the prices offered by other surgeons in the Los Angeles market, including Hughes, by reviewing the surgeons' websites or verified patient review sites, such as realself.com (an on-line healthcare marketplace for aesthetic treatments).

To determine the average price of surgeries performed by Hughes during the relevant time period, Dass did not consider any case-specific information, such as patient files, in reaching his pricing opinions. Instead, he reviewed Hughes's website and his realself.com review page, which revealed Hughes's pricing remained "very consistent" over time. In addition, Dass took into account a number of variables, including Hughes's education, certifications, before and after photographs, and reputation. Based on patients' direct reporting of Hughes's prices to Dass, patients' reported prices on realself.com, and prices posted on Hughes's website, Dass believed he had all the information needed to give a market-based opinion on the price of Hughes's surgeries.

After Dass testified, Boris moved to strike the testimony as lacking foundation. The trial court declined to strike Dass's testimony, finding it was more probative than prejudicial,

observing there was "lots of cross examination," and noting the jury would be instructed to give the testimony whatever weight the jury felt it was due.

### 2. *The trial court did not abuse its discretion*

Trial judges have a "substantial 'gatekeeping' responsibility" to ensure that an expert's opinion is based on both reliable material and sound reasoning. (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 769, 771 (*Sargon*); see also Evid. Code, §§ 801, 802.[5]) "[T]he matter relied on must provide a reasonable basis for the particular opinion offered, and . . . an expert opinion based on speculation or conjecture is inadmissible." (*Sargon, supra*, at 770.) The trial court's gatekeeping determination "is not a decision on its persuasiveness. . . . Rather, the court must simply determine whether the matter relied on can provide a reasonable basis for the opinion or whether that opinion is based on a leap of logic or conjecture." (*Id.* at 772.) We review a "ruling excluding or admitting expert testimony for abuse of discretion." (*Id.* at 773.)

In view of testimony from multiple witnesses that Boris failed to maintain accurate and complete patient payment records, the trial court did not err by allowing Dass to rely on an alternative, market-based method for determining the average price of surgeries performed by Hughes during the relevant period. In contrast to *Sargon* where the expert impermissibly compared a small company with multinational industry-leading companies (*Sargon, supra*, 55 Cal.4th at 777-778), Dass was

---

[5] Undesignated statutory references that follow are to the Evidence Code.

10

using his experience as a board certified plastic surgeon in private practice in Los Angeles with that of Hughes, a similarly credentialed and situated surgeon (*id.* at 778 [acknowledging that a comparison of "similar" or "comparable" businesses is a reasonable method]).  In addition to his experience generally and as a contract surgeon for Boris, Dass relied upon reasonably reliable information: reports from patients directly to him about the prices charged by Hughes, the published prices found on Hughes's website, and verified patient reports on realself.com about Hughes's pricing.  There was, in other words, no disqualifying leap in logic or an analytical gap between the data and the market-based opinion proffered.  (*Id.* at 771-772; see also *id.* at 775-776 ["'Where the fact of damages is certain, the amount of damages need not be calculated with absolute certainty. [Citations.]  The law requires only that some reasonable basis of computation of damages be used, and the damages may be computed even if the result reached is an approximation. [Citation.]  This is especially true where . . . it is the wrongful acts of the defendant that have created the difficulty in proving the amount of loss of profits [citation] or where it is the wrongful acts of the defendant that have caused the other party to not realize a profit to which that party is entitled.'  [Citation]"].)

> B.    *The Trial Court Did Not Err in Admitting Nolte's Lost Profit Analysis, Which Assigned to Hughes the Lost Profits of Elite*
> 1.    *Additional background*

On cross-examination, defense counsel questioned Hughes at some length about his corporation Elite, its accounting procedures, and its profits and losses.  Although Hughes

11

conceded he was doing surgeries on behalf of his corporation, he repeatedly testified he did not view his corporation as being separate from himself: "I thought I am Elite Plastic Surgery . . . [¶] . . . [¶] I'm collecting money from patients [not the corporation] . . . [¶] . . . [¶] As far as I was concerned, the checks to [Elite] were going to me." In addition, Hughes characterized the payments to his corporation for the surgeries he performed as simply an accounting "convenience." During redirect, Hughes testified he regarded his corporation's lost profits as his lost profits and he testified that when he asked in July 2014 that payments be made to his corporation, he told only Boris's bookkeeper (not Boris, or his son who managed the surgery center).

After Hughes testified about his corporation and immediately prior to Nolte's testimony, Boris objected to Nolte's lost profit analysis, arguing it was improper for him to assign the profits of a nonparty corporation to an individual shareholder of the corporation. Hughes countered that his request to have Boris pay his corporation, of which he was the sole shareholder, did not alter the basic terms of the parties' contract, which was between Hughes and Boris.

To resolve the issue, the court offered Boris the opportunity, if he thought the issue sufficiently "important," to include a question on the special verdict form that would ask the jury to determine whether during the relevant period Hughes was operating as a corporation or an individual. Boris declined the offer, and the court overruled his objection. The court explained it believed there was an absence of "concrete evidence" showing the injury of which Hughes complained was to his

corporation and—to the contrary—the pleadings and the evidence indicated the injury was to Hughes as an individual.

After the close of evidence, Boris's attorney asked the trial court to give the following special jury instruction: "Because corporate profits belong to the corporation, and not to the shareholders individually, lost profits are an ""injury to the corporation, or to the whole body of its stock"" [citation] and therefore are derivative in nature. When corporate lost profits are sought as damages, the gravamen of the complaint is injury to the corporation, not injury to an individual shareholder. [Citation.]" Before ruling on the request, the trial court renewed its offer to include an inquiry on this issue on the special verdict form if the defense believed the issue was sufficiently important; as before, the defense declined the offer. The court then ruled it would not give the proposed special instruction due to the "state of the evidence," but the court made clear the defense would be permitted to argue the issue to the jury, which the defense did.[6]

### 2.  Analysis

As a general rule, "a stockholder may not maintain an action in his own behalf for a wrong done by a third person to the corporation on the theory that such wrong devalued his stock and the stock of the other shareholders, for such an action would authorize multitudinous litigation and ignore the corporate entity." (*Sutter v. General Petroleum Corp.* (1946) 28 Cal.2d 525, 530 (*Sutter*); accord, *Grosset v. Wenaas* (2008) 42 Cal.4th 1100,

---

[6]     The jury awarded more than $1.6 million to Hughes in lost profits, and this amount suggests the jury found the defense argument unpersuasive.

13

1108, fn. 5.) However, where "'the injury is . . . to the plaintiff as a stockholder and to him individually, and not to the corporation, as where the action is based on a contract to which he is a party, or on a right belonging severally to him, or on a fraud affecting him directly, it is an individual action. . . . [Citations.] And a stockholder may sue as an individual where he is directly and individually injured although the corporation may also have a cause of action for the same wrong. [Citations.]" (*Sutter*, *supra*, 28 Cal.2d at 530; accord, *Schrage v. Schrage* (2021) 69 Cal.App.5th 126, 149.)

Here, the trial court did not err in allowing Nolte to attribute Elite's lost profits to Hughes because the record indicated the alleged wrongs occurred to Hughes individually. The contracts, written and oral, were between Hughes and Boris, not between Elite and Boris. The before and after photographs at issue and the consents to use them for advertising predated Elite's creation and were between Hughes and his pre-Boris patients. Boris's allegedly defaming remarks concerned Hughes alone, and did not refer to Elite. Further, although Hughes formed Elite while working for Boris, Hughes never made the corporation a party to his contract with Boris, nor did he even advise any of the principals running the surgery center of the corporation's existence (instead only informing the bookkeeper). In addition, the evidence at trial was that Hughes was Elite's only officer, only shareholder, and the only employee of the corporation directly performing the work that generated revenue for the corporation. In light of the state of the evidence, the trial court reasonably concluded the jury should have the ability to credit Nolte's assignment of Elite's profit and losses to Hughes.

14

*Sole Energy Co. v. Petrominerals Corp.* (2005) 128 Cal.App.4th 212 (*Sole*), the case on which Boris chiefly relies, is not to the contrary. In that case, putative shareholders in a corporation that had never issued stock sued the corporation (and others) seeking lost future profits. The jury ruled for the plaintiffs, but the trial court granted judgment notwithstanding the verdict. The Court of Appeal affirmed judgment for the defendants because "the gravamen of the injury asserted—lost profits—was derivative and could not be recovered by [the putative shareholders] individually." (*Id.* at 232.) In reaching that result, the *Sole* court summarized governing law: "Whether a cause of action is derivative or can be asserted by an individual shareholder is determined by considering the wrong alleged. "'[T]he action is derivative, i.e., in the corporate right, if the gravamen of the complaint is injury to the corporation, or to the whole body of its stock and property without any severance or distribution among individual holders, or it seeks to recover assets for the corporation or to prevent the dissipation of its assets.'" [Citations.]" (*Id.* at 228.) However, where ""the injury resulted from the violation of some special duty owed the stockholder by the wrongdoer and having its origin in circumstances independent of the plaintiff's status as a shareholder,"" the cause of action belonged to the individual shareholder. (*Id.* at 229; accord, *Nelson v. Anderson* (1999) 72 Cal.App.4th 111, 124 ["it is the gravamen of the wrong alleged in the pleadings, not simply the resulting injury, which determines whether an individual action lies"].) Because the operative complaint here alleged wrongs arising out of duties owed to Hughes individually by Boris, duties that predated by a matter of years Hughes's formation of Elite and arose independent of

15

Hughes's status as Elite's sole shareholder, the alleged wrongs were done to Hughes, and not his corporation.

### C. The References to Unproven Malpractice Accusations Against Hughes Were Properly Excluded

In a defamation action, "[t]he truth of a statement is an absolute defense against civil liability. [Citation.] The defendant does not need to prove the literal truth of every word in the challenged statement; the defense is complete 'so long as the imputation is substantially true so as to justify the "gist or sting" of the remark.' [Citation.]" (*Tilkey v. Allstate Insurance Co.* (2020) 56 Cal.App.5th 521, 550-551.) Boris contends the trial court's ruling on two pre-trial motions in limine "completely deprived" him of his primary defense of truth to Hughes's defamation claim.

### 1. Additional background

In August 2014, while working at Boris's surgery center, Hughes performed a liposuction procedure commonly referred to as a "Brazilian Butt Lift" on a woman A.V. The procedure involved transferring fat from the patient's upper arms, thighs, and back to her buttocks. After the fat injections were completed, the patient developed complications and was taken to a hospital where she died. Eleven months later, in July 2015, Hughes performed a similar procedure on patient T.W. and she also developed complications and ultimately died.

The families of A.V. and T.W. filed wrongful death actions against Hughes (the malpractice actions). The action on behalf of T.W.'s survivors was dismissed. A jury found in favor of Hughes on the claims brought by A.V.'s survivors, but a new trial was

16

ordered due to juror misconduct (the new trial had not been completed at the time of the trial in this case).

In 2017, the Medical Board of California (Medical Board) filed an accusation against Hughes alleging, among other things, gross negligence in his care and treatment of A.V. and T.W., among others.[7] In January 2019, the administrative law judge overseeing the proceeding issued a proposed decision finding the Medical Board presented no evidence with regard to A.V.'s death and did not present clear and convincing evidence that Hughes's treatment of T.W. fell below the prevailing standard of care.[8]

Before trial, Hughes moved to preclude any reference to either the accusation in the Medical Board proceeding (motion in limine No. 1) or the complaints in the malpractice actions (motion in limine No. 2). Hughes argued any such reference would be irrelevant and/or unduly prejudicial. On the same grounds, Hughes also moved to preclude Boris from referring to any patient complications, including death, that occurred in connection with surgeries he performed (motion in limine No. 8).

Boris opposed all three motions. In the main, Boris argued specific reference to the Medical Board proceeding and the

---

[7] The investigation that ultimately led to the Medical Board's accusation was triggered by a telephone call from Boris to the Medical Board in September 2015 (one month after Hughes stopped working for Boris) advising that Hughes's surgical privileges at Boris's surgery center had been revoked.

[8] The proposed decision further found the Medical Board had not supported any of its other allegations of negligence and professional misconduct against Hughes and dismissed the accusation.

malpractice actions, as well as discussion generally of complications suffered by Hughes's patients, was necessary to rebut Hughes's defamation cause of action because the evidence would show Boris's statements to third parties about Hughes's qualities as a surgeon were not made without reasonable care as to the truth of those statements.

After hearing oral argument from the parties, the trial court granted Hughes's motions regarding the Medical Board accusation and the malpractice complaints. Pursuant to section 352, the court found that the probative value of allowing evidence regarding those proceedings would be substantially outweighed by the undue prejudice to Hughes and would be "confusing" to the jurors or "completely misle[a]d" them. As for Hughes's motion to preclude evidence of patient complications, the court deferred ruling because it had to "allow the defense to defend against" the defamation claim. Later, during trial, the court ruled the defense could introduce evidence of complications. The court clarified that while the defense could not mention "malpractice" or "death," it could inquire of witnesses about patient complications, including "extreme complications."

During its cross-examination of Hughes, defense counsel inquired briefly and generally about complications which can arise during surgery, including "very severe" and "extremely significant" complications, and obliquely referred to the "pretty significant complications" suffered by T.W. in July 2015. During direct examination of Boris, however, defense counsel did not inquire about Boris's beliefs as to Hughes's qualities as a surgeon or how they may have changed over time as a result of complications suffered by Hughes's patients.

18

## 2. The trial court did not abuse its discretion in granting Hughes's motions in limine

Under section 352, a trial court may in its discretion "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." Evidence is substantially more prejudicial than probative if it creates an "'intolerable "risk to the fairness of the proceedings or the reliability of the outcome."'" (*People v. Jablonski* (2006) 37 Cal.4th 774, 805.) Consistent with the general rule under well-established law, we review the trial court's section 352-based ruling on the motions in limine for abuse of discretion.[9] (See, e.g., *Moore v. Mercer* (2016) 4

---

[9] The exception to the general rule is "[w]hen all evidence on a particular claim is excluded based on a motion in limine," in which case "the ruling is subject to independent review as though the trial court had granted a motion for judgment on the pleadings or, if evidence was offered, a motion for nonsuit. [Citations.]" (*Dillingham-Ray Wilson v. City of Los Angeles* (2010) 182 Cal.App.4th 1396, 1402; accord, *Kinda v. Carpenter* (2016) 247 Cal.App.4th 1268, 1279-1280 [holding the granting of a motion in limine to exclude all evidence on an element of proof in a defamation action was the equivalent to a nonsuit and subject to de novo review].)

Boris maintains that the correct standard of review is de novo, because the trial court rulings on the Medical Board accusations and the malpractice actions "completely eviscerated" his defense that he had taken reasonable care in determining the truth of the allegedly defaming statements. Boris's argument ignores the court's decision to allow evidence of complications in surgeries performed by Hughes. Because the court did not

Cal.App.5th 424, 444; *McMillin Companies, LLC v. American Safety Indemnity Co.* (2015) 233 Cal.App.4th 518, 529.)

The trial court's assessment that permitting the jury to hear the allegations in the Medical Board proceeding and the malpractice actions would be unduly prejudicial and confuse the issues was not an abuse of discretion. The Medical Board did not present any evidence in support of its allegations regarding A.V.'s death and the civil lawsuit brought by her survivors was dismissed in Hughes's favor. The proposed decision in the Medical Board proceeding that was available to the parties at the time of trial also found insufficient evidence of professional misconduct by Hughes in connection with his treatment of T.W and the first trial in the wrongful death action brought by her survivors resulted in a judgment in Hughes's favor before a new trial was ordered because of juror misconduct. Under these circumstances, the court reasonably concluded reference to the emotionally freighted but ultimately unproven allegations would create an unfair emotional bias against Hughes that warranted exclusion under section 352. Not only that, the court was reasonably concerned with the possibility of confusion of the issues and the very real prospect of turning what was supposed to be adjudication of a defamation claim into a mini-trial on the truth of collateral malpractice allegations. The court therefore did not abuse its discretion in limiting Boris's presentation of evidence: permitting presentation of evidence of complications, including "extreme complications," suffered by patients of Hughes

_____

preclude all evidence bearing on the reasonableness of Boris's belief in his statement that Hughes was not a good doctor, abuse of discretion is the proper standard of review.

20

but excluding reference to the allegations in the Medical Board proceeding and the related malpractice actions.[10]

### D. Substantial Evidence Supports the Emotional Distress Award

Boris maintains insufficient evidence supports the jury's award of damages for emotional distress because the only supporting evidence was Hughes's testimony about how he felt when he learned Boris had converted Hughes's before and after photography for his own use and when he learned of Boris's defamatory statements; Boris also asserts the award was excessive.[11] Under the deferential substantial evidence standard

---

[10] Indeed, under the court's ruling, the defense could have further questioned Boris about the facts underlying his allegedly defamatory remarks, i.e., about how complications or extreme complications suffered by Hughes's patients affected Boris's beliefs about the former's competence as a surgeon. The defense did not do that, but that choice was not compelled by the trial court's ruling.

[11] In the operative complaint, Hughes sought emotional distress damages for the defamation cause of action only. Pursuant to the special verdict form approved by the defense, the jury was asked to consider emotional distress damages for defamation and the following causes of action: interference with contractual relations, interference with prospective economic relations, conversion, appropriation of name or likeness under both common law and the Civil Code section 3344, and fraudulent concealment. Ultimately, the jury awarded emotional distress damages in connection with only three causes of action: interference with contractual relations, conversion, and defamation.

of review that applies (see, e.g., *Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881), Boris's argument is unpersuasive.

At trial, Hughes testified he never gave Boris permission to publish his portfolio of before and after photographs on Boris's website. When he learned Boris had "completely copied" his portfolio of before and after photographs and posted them on his website, Hughes testified he felt "violated," "[t]aken advantage of," "[r]ipped off," "[c]onned," "not good" and "depressed." In addition, Hughes testified he worried constantly about being sued by his former patients because they had given their consent to use the photographs to Hughes alone. As for Boris's defamatory remarks, Hughes explained to the jury that he felt "damaged" by them.

The jury and the trial court (sitting as the 13th juror when it ruled on Boris's motion for a new trial) found Hughes's testimony to be sufficiently truthful and compelling to justify an award of emotional distress damages. As our Supreme Court has stated, "[t]hese determinations are entitled to great weight."

---

Boris also argues the emotional distress damages award is infirm because it was based on causes of action other than defamation. There was no objection to the special verdict form's provisions regarding the scope of the award for emotional distress damages, however, and the point is accordingly forfeited. (*Jensen v. BMW of North America, Inc.* (1995) 35 Cal.App.4th 112, 131 [objection to a special verdict form must be made before the jury is discharged or it is waived]; *Fransen v. Washington* (1964) 229 Cal.App.2d 570, 574 ["If the form of a verdict is defective the complaining party must object in the lower court, since the failure to so object results in a waiver of any defect of form"].) We therefore resolve only the sufficiency of the evidence argument on the merits.

(*Seffert v. Los Angeles Transit Lines* (1961) 56 Cal.2d 498, 506.) Indeed, there is no basis here for disregarding them. Hughes's testimony was sufficient by itself to support the award: "The law in this state is that the testimony of a single person, *including the plaintiff,* may be sufficient to support an award of emotional distress damages." (*Knutson v. Foster* (2018) 25 Cal.App.5th 1075, 1096 [affirming award of $400,000 for noneconomic damages even though plaintiff's testimony was not supported by any expert testimony on the extent of her emotional distress]; *Stanley v. Richmond* (1995) 35 Cal.App.4th 1070, 1097 [reversing grant of nonsuit, stating: "If credited by the jury, appellant's testimony about the extreme pressure she was under and her state of mind . . . may well be sufficient to support an award of damages for emotional distress from the alleged breaches of fiduciary duty"]; *Little v. Stuyvesant Life Ins. Co.* (1977) 67 Cal.App.3d 451, 460, 465 (*Little*) [affirming jury's award of emotional distress damages which was based on plaintiff's testimony alone].)

As for the size of the emotional distress damages, we defer to the judgment of the jury and the trial court. (*Little, supra,* 67 Cal.App.3d at 465 ["There is no fixed or absolute standard by which to compute the monetary value of emotional distress, and a reviewing court must give considerable deference in matters relating to such damages to the jury in the first instance and to the trial court secondarily"].) An award of $422,000 in emotional distress damages where the total award exceeded $3.4 million "cannot be said to be so grossly excessive as to be reasonably imputed only to passion or prejudice in the jury." (*Seffert, supra,* 56 Cal.2d at 507.)

*E.     Boris Forfeited His Argument Regarding the Secondary Evidence Rule by Failing to Make a Specific Objection on that Ground*

Boris maintains Hughes should not have been allowed, "over Boris's objection," to testify about the content of the patient consent forms because, under section 1523, oral testimony is not admissible to prove the content of a writing. As we will explain, however, there was no specific objection to oral testimony by Hughes about the content of the patient consent forms—and the absence of an objection forfeits the contention.

*1.     Additional background*

After beginning work for Boris, Hughes posted on his individual professional website "before and after" photographs of patients from surgeries performed during his residency and fellowship. Although Hughes never gave permission for Boris to use his before and after photographs, those images were transferred to Boris's website by Boris's website consultant so that it appeared the surgeries had been performed at Boris's surgery center.

During discovery, Hughes produced hundreds of before and after photographs predating his work for Boris and represented he owned the photographs and had the patients' consent to use the photographs for advertising on his website; Hughes, however, resisted disclosure of the patients' identifying information.

Prior to trial, Boris moved to preclude the use of the photographs because Hughes had not disclosed the patients' identifying information during discovery. The motion did not

refer to the secondary evidence rule[12] or cite to statutes (§ 1520 et seq.) that codify the rule. In opposition, Hughes argued the patients' identifying information, even if permitted by patient privacy laws, was irrelevant to Hughes's conversion cause of action.

At the hearing on the motion, Boris's attorney argued evidence of the patients' consent to Hughes's use of the photographs was relevant because Hughes needed to show the right to possess or otherwise control the photographs to prevail on his conversion cause of action. Defense counsel did not refer to the secondary evidence rule or argue that oral testimony by Hughes about the content of the written consents was inadmissible under the rule. The trial court denied the motion, finding that, since the photographs had been used for years without challenge by any of the patients, proof of consent was "just wholly unnecessary."

Later during trial, Hughes testified he obtained from each patient oral and written consent to utilize their before and after photographs for advertising purposes. While Hughes testified

---

[12]   The secondary evidence rule provides "oral testimony is not admissible to prove the content of a writing" except under certain statutory exceptions. (§ 1523, subd. (a).) One such exception is "if the proponent does not have possession or control of the original or a copy of the writing and either of the following conditions is satisfied: [¶] (1) Neither the writing nor a copy of the writing was reasonably procurable by the proponent by use of the court's process or by other available means. [¶] (2) The writing is not closely related to the controlling issues and it would be inexpedient to require its production." (§ 1523, subd. (c).)

generally about the nature of the consent forms, he did not offer any specific testimony about their content and he did not introduce in evidence any consent forms signed by any of his patients before his employment with Boris. The defense did not object to any of Hughes's direct testimony on secondary evidence grounds.[13] On cross-examination, Hughes explained he did not produce any of the executed consent forms from his pre-Boris surgeries because, with one exception, he could not remember his patients' names due to the interval of almost a decade between the surgeries and trial.

> 2.  *By failing to specifically object to Hughes's testimony, Boris forfeited the secondary evidence issue*

Section 353 requires that an objecting party "make clear the specific ground of the objection or motion." Our high court has elaborated: "[A] trial objection must fairly state the specific reason or reasons the defendant believes the evidence should be excluded. If the trial court overrules the objection, the defendant may argue on appeal that the court should have excluded the evidence for a reason asserted at trial. A defendant may not argue on appeal that the court should have excluded the evidence for a reason not asserted at trial." (*People v. Partida* (2005) 37 Cal.4th 428, 431; accord, *Quiles v. Parent* (2018) 28 Cal.App.5th 1000, 1013 ["'[f]ailure to raise specific challenges in the trial court

---

[13] Defense counsel objected only twice during this portion of Hughes direct examination, once because a question called for a narrative and a second time because a question was vague as to the type of consent.

26

forfeits the claim on appeal'"].) "The objection must be specific enough as to 'fairly inform the trial court, as well as the party offering the evidence, of the specific reason or reasons the objecting party believes the evidence should be excluded, so the party offering the evidence can respond appropriately and the court can make a fully informed ruling.'" (*People v. Lucas* (2014) 60 Cal.4th 153, 264-265 [objection made at trial to photograph of a document was insufficient to preserve contention that the photograph was admitted in violation of the "best evidence" rule because that specific objection was not made], disapproved on another ground in *People v. Romero and Self* (2015) 62 Cal.4th 1, 53-54, fn. 19.)

Here, neither Boris's motion in limine nor his counsel's amplifying arguments at the hearing on the motion fairly informed the court or Hughes's counsel that Boris objected to oral testimony by Hughes regarding the content of the written consents. The defense's written and oral argument in support of the motion were directed in the first instance, not at the content of the written consents, but at their very existence. While the consents' existence and their content are, arguably, related issues, the motion cannot reasonably be read as to include an objection based on the secondary evidence rule when neither the rule nor any applicable legal authority was included in the motion or at oral argument. As our Supreme Court has made clear, the objecting party cannot rely on a general "placeholder" objection. (See, e.g., *People v. Demetrulias* (2006) 39 Cal.4th 1, 22 ["the opponent cannot make a 'placeholder' objection stating general or incorrect grounds (e.g., 'relevance') and revise the objection later in a motion to strike stating specific or different grounds"].)

Moreover, even if Boris's motion in limine could be construed as having been directed to Hughes's oral testimony at trial about the content of the consents, Boris was required to renew his objection at trial. "'[W]hen an *in limine* ruling that evidence is admissible has been made, the party seeking exclusion must object at such time as the evidence is actually offered to preserve the issue for appeal.' [Citations.]" (*People v. Morris* (1991) 53 Cal.3d 152, 189, disapproved on another ground in *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1.) At trial, Boris did not object to Hughes's testimony about the patient consents on the ground such testimony ran counter to the secondary evidence rule. The issue is accordingly forfeited.

F.    *Boris Forfeited His Challenge to the Jury's Purportedly Excessive Award for Intentional Interference with Contractual Relations*

Boris maintains the award for intentional interference with contractual relations was excessive and disproportionate. This argument, too, is forfeited because Boris did not request a special verdict form segregating the damages by cause of action.

The special verdict form did not ask the jury to award damages for each cause of action for which it found Boris liable. Instead, it asked the jury to award damages for the following categories: breach of contract or quantum meruit, lost profits, emotional distress damages, and damages for loss of reputation and harm to the business and commercial value of a name or likeness. Several damage categories accordingly covered multiple causes of action. For example, the awards for lost profits and emotional distress each applied to three causes of action for which the jury found Boris liable: intentional interference with

28

contractual relations, conversion, and defamation. The defense did not request that the special verdict form include a specific damage award for each of these causes of action or object to the form aggregating damages from several different causes of action into composite awards for lost profits and emotional distress.

It is well established that "[t]o preserve for appeal a challenge to separate components of a plaintiff's damage award, a defendant must request a special verdict form that segregates the elements of damages." (*Greer v. Buzgheia* (2006) 141 Cal.App.4th 1150, 1158 (*Greer*) [holding defendant forfeited challenge to damages award by not requesting special verdict form containing a separate entry for the plaintiff's past medical expenses]; accord, *Hurley v. Department of Parks & Recreation* (2018) 20 Cal.App.5th 634, 655-656 [defendant "waived or forfeited her contention on appeal that there is insufficient evidence to support a verdict finding her liable" under the Information Practices Act because she failed to request clarifying instructions on that act's specific elements].) That was not done here, and the absence of such a special verdict request forecloses reversal on the ground Boris now urges. (See, e.g., *Greer, supra,* 141 Cal.App.4th at 1158 ["Without a special verdict separating the various damage components, 'we have no way of determining what portion—if any' of an award was attributable to a particular category of damages challenged on appeal"].)

## DISPOSITION

The judgment is affirmed.  Hughes is awarded costs on appeal.


NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS



BAKER, J.

We concur:


RUBIN, P. J.


KIM, J.